**In re Larry P. ROBERTS and Barbara L. Roberts, Debtors.**

**In re ROBERTS, INC., Debtor.**

**Bankruptcy Nos. 82C–01037, 82C–01038.**

United States Bankruptcy Court, D. Utah.

Feb. 4, 1985.

William G. Fowler and Michael N. Zundel of Roe & Fowler,[1] Salt Lake City, Utah, for debtors.

## MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

### CASE SUMMARY

These cases, consolidated for purposes of this opinion, come before the Court on two applications for allowance of interim compensation filed by the law firm of Roe & Fowler, attorneys for debtors in possession in both cases. Raised here is the recurring question of whether or not a law firm's representation of more than one party to a case creates a conflict of interest that warrants a disallowance or reduction in the legal fees and costs requested. For the reasons set forth below, the applications in both of these cases are denied in their entirety.

### JURISDICTION

The Court determines that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a "core" proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O).

### FACTS AND PROCEDURAL BACKGROUND

On April 30, 1982, ROE & FOWLER, a Salt Lake City law firm with a respected reputation for its work before this Court, filed petitions under Chapter 11 on behalf of Larry P. and Barbara L. Roberts, husband and wife (jointly "Roberts") (Case No. 82C–01037) and on behalf of Roberts, Inc., a Utah corporation ("the corporation"), owned by the Roberts and their children (Case No. 82C–01038).

In conjunction with the filing of these petitions, ROE & FOWLER also filed, in each case, an Application for Employment of Attorneys for Debtor. Each application included the following language:

2. In support of this motion the debtors show the court that the firm of Roe and Fowler does not hold or represent any interest adverse to the estate, is disinterested in connection therewith, and is, in the debtors' opinion, competent to represent the debtors' interests in this matter.

Each fee application was also accompanied by an affidavit signed by William G. Fowler for his firm, asserting that Fowler (1) "is an attorney at law, duly admitted to practice in the State of Utah and in this court," (2) "is a member of the firm of Roe and Fowler and maintains an office for the practice of law at 340 East Fourth South, Salt Lake City, Utah," and (3) "believes, and therefore states, that he has no interest adverse to the estate of the debtor and that he is a disinterested person within the meaning of 11 U.S.C. Section 101(13)." The affidavits were signed, duly notarized, and dated April 29, 1982. The Court approved the employment of Roe & Fowler in both cases in May of 1982.

At the time of the filing of these petitions, there existed the following facts most of which were unknown to the Court:

1. Roe & Fowler had represented Larry P. Roberts, Barbara L. Roberts, and Roberts, Inc. prior to the filing by them of any petitions in bankruptcy.

2. Roe & Fowler continued to represent these parties after the petitions were filed.

3. Roe & Fowler was a creditor of the corporation with a scheduled claim of $2,241.50 for fees incurred in 1979 for legal services unrelated to the bankruptcy case.

4. Larry and Barbara Roberts were officers and directors of Roberts, Inc.

5. Larry Roberts owed Roberts, Inc. $43,196.51.

---

1. Roe & Fowler is now known as Roe, Fowler & Moxley. Michael Zundel is no longer with the firm.

6. Roberts, Inc. owed Barbara Roberts $57,693.87.

On January 13, 1984, Roe & Fowler filed verified fee applications seeking payment (1) in the Roberts' case in the sum of $4,844.50 in fees and $490.80 in costs for a total of $5,335.30 and (2) in the corporation's case in the sum of $9,839.50 in fees and $368.68 in costs for a total of $10,208.18. The grand total sought in both fee applications was $15,543.48 of which the sum of $849.48 represented costs and $14,684.00 represented fees incurred between April 28, 1982 and December 20, 1983.

Both applications, made pursuant to 11 U.S.C. §§ 330 and 331, were detailed, thorough, and set forth, by way of exhibits, not only summaries of the various attorneys' hours, rates, and amounts billed in each case, but contained detailed daily time-log entries for each case showing, by date, a description of the services performed, the attorney or other employee providing the service, the time (in tenths of hours) expended in the performance of each service, and the hourly rate charged. Reimbursable expenses advanced by the firm were also set forth. The Court finds no deficiency in the form of the applications.

## ISSUE

The only question raised is whether Roe & Fowler's representation involved a conflict of interest so serious as to require this Court to deny the costs and fees sought in the applications or to reduce the amount of costs and fees requested therein.

## ARGUMENT

Roe & Fowler's fee applications were predicated upon this Court's order approving the employment of Roe & Fowler under Section 327(a) of the Code, which provides that a trustee (or debtor in possession) may employ attorneys:

> that do not hold or represent an interest adverse to the estate, and that are disinterested persons....

Roe & Fowler asserts that it neither holds nor represents an interest adverse to either of these estates. It also argues, with regard to the corporation's case, that although it is an unsecured creditor of the corporation and therefore not a "disinterested person" as defined in Section 101(13) of the Code, Roe & Fowler, nevertheless, is qualified to serve as general counsel for the corporation, acting as a debtor in possession, because of the following provisions of Section 1107:

> Notwithstanding Section 327(a) of this title, a person is not disqualified for employment under Section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

Roe & Fowler concludes that this provision allows it to represent the corporate debtor in possession, despite Roe & Fowler's status as an unsecured creditor in that case. In reaching this conclusion, Roe & Fowler relies upon the case of *In re Heatron, Inc.*, 5 B.R. 703, 6 B.C.D. 883, 2 C.B.C.2d 1054 (W.D.Mo.1980), particularly the following language found at 5 B.R. 884:

> The court concludes that an attorney who has represented the debtor prior to the filing of the bankruptcy proceeding, who assisted in the preparation of the petition and who is a major creditor, without more, does not have an interest adverse to the debtor.

Neither Roe & Fowler's application for appointment as counsel nor its fee applications address the conflicts of interest created by the fact that Roberts, Inc. was a creditor of Larry Roberts and that Barbara Roberts was a creditor of Roberts, Inc. Counsel does not disclose the conflict created by its simultaneous representation of clients with interests adverse to those of other clients. Nor does it disclose the conflict created by its simultaneous representation of the corporate debtor and its officers and directors, who are debtors in their own right.

Roe & Fowler, however, did address these conflicts in a Memorandum in Support of Fee Application filed after the filing of the fee applications and because the

Court, during the course of the confirmation proceedings, "questioned whether Roe & Fowler may have represented the debtors with a conflict of interest between their estates in light of the debtor/creditor relationship." (Fee Application p. 2).

## APPLICABLE LAW OF CONFLICTS OF INTEREST

Though this Court could have summarily dispensed with the issues presented to it in this case, the increasing number of conflicts issues now coming before the Court, the complexity and extent of the law touching on conflicts issues, the need to inform the practicing bar of the conflicts case law developing under the Bankruptcy Code and Rules, and the need to articulate in as complete a form as possible the law of this jurisdiction as it has been set forth in numerous unpublished opinions and rulings convinced the Court that a thorough analysis of the law of conflicts of interest as it impacts on bankruptcy cases and proceedings is well-advised.

### Section 327(a) of the Code

Section 327(a) of the Code states:

[T]he trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate and that are disinterested persons to represent or assist the trustee in carrying out the trustee's duties under this title.

This provision must be read together with Bankruptcy Rule 2014, which went into effect on August 1, 1983, by order of the United States Supreme Court:

(a) *Application for and Order of Employment.* An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professional persons pursuant to § 327 or § 1103 of the Code shall be made only on application of the trustee or committee, stating the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for his selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants.

(b) *Services Rendered by Member or Associate of Firm of Attorneys or Accountants.* If, under the Code and this rule, a law partnership or corporation is employed as an attorney, or an accounting partnership or corporation is employed as an accountant, or if a named attorney or accountant is employed, any partner, member, or regular associate of the partnership, corporation or individual may act as attorney or accountant so employed, without further order of the court.

This rule continues the requirement of former Bankruptcy Rule 215(a) for court approval of the appointment of the attorney for the debtor in possession. The remainder of former Rule 215 is covered by Section 327.

The qualification requirements of Section 327 "apply to both the trustee and the debtor in possession."[2] It is well-settled that a debtor in possession has all the rights, powers, and duties of a trustee and stands "in the shoes of a trustee in every way."[3] Therefore, the attorney for the debtor in possession, like the attorney for the trustee, must meet the requirements of

---

**2.** *In re Leisure Dynamics,* 32 B.R. 753, at 754, 9 C.B.C.2d 265 (Bky.D.Minn.1983), *aff'd,* 33 B.R. 121, 11 B.C.D. 1116 (D.Minn.1983). *See also, In re Searles Castle Enterprises,* 12 B.R. 127 (Bky.D. Mass.1981), *aff'd,* 17 B.R. 440 (Bky.App.Pan. 1st Cir.1982); *In re Cummins,* 8 B.R. 701, 3 C.B. C.2d 793 (Bky.C.D.Calif.1981), *rev'd* 15 B.R. 893,

8 B.C.D. 537 (Bky.App.Pan. 9th Cir.1981), *reh. denied,* 20 B.R. 652, 9 B.C.D. 158, Bankr.L.Rep. (C.C.H.) ¶ 68706 (Bky.App.Pan. 9th Cir.1982).

**3.** *See* S.Rep. No. 95–989, 95th Cong., 2d Sess., 116 (1978); 1978 U.S.Code Cong. & Admin. News, p. 5787, 5902.

Section 327(a).[4]

■ However, "there is no requirement in the Bankruptcy Code that an attorney for a debtor in Chapter 7 be disinterested. Moreover, there is no requirement for court approval of a Chapter 7 debtor's employment of an attorney." [5]

■ This Court has observed that the requirements of Section 327, which are binding on trustees and Chapter 11 debtors in possession are subject to:

> five exceptions.... [1] for house counsel.... [2] if counsel has heretofore represented a creditor [but] if counsel doesn't represent the creditor in connection with the case.... [3 for] the trustee to represent himself if it is in the best interest of the estate.... [4 for] prior counsel to the debtor to be special counsel for the trustee if it is on different matters and if it is in the best interest of the estate.... Finally [5] Section 1107(b) ... provides that the fact that counsel previously represented the debtor shall not disqualify counsel from representing the debtor in possession.[6]

None of these is a safe harbor. For example, with regard to the second of these exceptions, Section 327(c) states that a professional is not disqualified "solely because of such person's employment by or representation of a creditor," so long as he does not represent them simultaneously in connection with the case. The emphasis here is on the word *"solely,"* which means that, if other circumstances exist, disqualification may be required in spite of the exception. The same is true of the exception allowed under Section 1107(b), which contains similar qualifying language with regard to the representation of the debtor. The other exceptions are qualified by the requirement that the employment must be "in the best interest of the estate." [7]

The *Leisure Dynamics* court rejected an attempt to twist Section 327(a) into a "disqualification" section. The court observed:

> The Code states that the attorney must be both disinterested and not hold or represent an interest adverse to the estate. § 327(a) is [a] qualification section, and as such, failure to meet either element mandates disqualification.[8]

■ Thus, to be qualified under Section 327(a), attorneys and other professionals must meet two requirements: (1) they must not hold or represent an interest adverse to the estate; and (2) they must be disinterested persons within the meaning of the Code.[9] "[E]ither prong of section 327(a) requires an attorney employed by a debtor in possession to be free of ... actual and potential conflicts of interest." [10] It is clear that "divided loyalties are a con-

---

**4.** *Matter of the Cropper Company, Inc.,* 35 B.R. 625, at 628, 11 B.C.D. 637 (Bky.M.D.Ga.1983). *In re Seatrain Lines, Inc.,* 13 B.R. 980, at 981, 8 B.C.D. 192, 4 C.B.C.2d 1558 (Bky.S.D.N.Y.1981).

**5.** *In re Career Concepts fka United Personnel, Inc.,* No. 81C–01939, unpublished memorandum decision (Bky.D.Utah, June 13, 1983) (Clark, J.). In accord with this view is the statement of the court in *In re Coastal Equities, Inc.,* 39 B.R. 304, at 310 (Bky.S.D.Cal.1984):

> Prior to the conversion, the debtor was a debtor in a Chapter 7 liquidation case. After the appointment of the trustee, the debtor was a debtor out of possession. At both of these times, court approval of an attorney for the debtor is not required. *See 2 Collier on Bankruptcy,* Para. 327.07 (15th ed.); *In re Designaire Modular Home Corp.,* 517 F.2d 1015, 1018–19 (3rd Cir.1975); *In re Mullendore,* 527 F.2d 1031, 1035 (10th Cir.1975); *In re Triangle Chemicals, Inc., supra,* 697 F.2d [1280] at 1289.

**6.** *In re Cottontree Inn Associates,* No. 81M–00511, (Transcript of Ruling at 5–6) (Bky.D. Utah, June 2, 1983) (Mabey, J.).

**7.** *Id.*

**8.** *In re Leisure Dynamics, supra,* 32 B.R. at 754.

**9.** *In re Leisure Dynamics, supra,* 33 B.R. at 122.

**10.** *Matter of the Cropper Company, Inc., supra,* 35 B.R. at 631. *See also, In re Realty Associates Securities Corp.,* 56 F.Supp. 1007 (E.D.N.Y. 1944); *Nolan v. Judicial Council of the Third Circuit,* 346 F.Supp. 500 (D.N.J.1972), *aff'd, In re Imperial "400" Nat., Inc.,* 481 F.2d 41 (3d Cir. 1973), *cert. denied, Union Bank of Los Angeles v. Nolan,* 414 U.S. 880, 94 S.Ct. 68, 94 S.Ct. 71, 38 L.Ed.2d 125 (1973); 2 Collier on Bankruptcy, 15th ed., ¶ 327.03[3][f], at 327–18 (15th ed. 1984).

cern, and the Code is more specific about the matter than was previous law." [11] Though the standards for the employment of professional persons under the Code are quite strict, "Congress has determined that strict standards are necessary in light of the unique nature of the bankruptcy process." [12]

### Section 327(c) of the Code

The provisions of Section 327(c), which govern in this case, provide:

> In a case under chapter 7 or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, but may not, while employed by the trustee, represent, in connection with the case, a creditor.

■ Under this provision, an attorney who is employed by the trustee or debtor in possession will not be involved in an impermissible conflict of interest solely because of a former representation of a creditor in the case. However, such a conflict of interest would exist if the attorney were to represent the trustee and a creditor simultaneously.

This provision was substantially amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984.[13] The amendments to § 327(c) do not apply to cases pending on October 8, 1984, but only to cases commenced on or after that date and, therefore, are not applicable in this case. But they are instructive. The 1984 amendments to Section 327(c) provide:

> In a case under chapter 7 or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor, in which case the court shall disapprove such employment if there is an actual conflict of interest.[14]

An attorney may, under the amended version of Section 327(c), represent both the trustee and a creditor or creditors, unless another creditor objects *and* the court finds that such representation involves an *actual*, rather than theoretical, conflict of interests. This provision substantially loosens the restrictions on creditors' attorneys wishing to serve as general counsel to trustees or debtors in possession.

### Section 327(d) of the Code

Section 327(d) of the Code provides:

> The court may authorize the trustee to act as attorney or accountant for the estate if such authorization is in the best interest of the estate.

This section was left unchanged by the 1984 Bankruptcy Amendments. Of this section, the Court in *In re Smith* stated:

> Section 327(d) specifically permits the court to authorize a trustee to act as attorney if such authorization is in the best interest of the estate, and the legislative history of that section is clear in that the court may authorize the trustee, if qualified, to act as his own counsel. House Report No. 95–595, 95th Cong., 1st Sess. (1977) 328.... The legislative history of Section 328(b) indicates that the purpose of permitting the trustee to serve as his own counsel is to reduce costs. The House Report further states that the purpose "is not to provide the trustee with a bonus by permitting him to receive two fees for the same service.... Thus, this subsection requires the court to differentiate between the trustee's services as trustee, and his services as trustee's counsel, and to fix compensation accordingly." House Report 95–595, 95th Cong. 1st Sess. (1977) 328–329, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6285; Senate Report No. 95–989, 95th Cong.2d Sess. (1978), 39

---

11. *In re Arden Spencer Howard,* No. 82C–02016, unpublished memorandum opinion and order, at 2 (Bky.D.Utah Dec. 21, 1983) (Clark, J.).

12. *Matter of the Cropper Company, Inc., supra,* 35 B.R. at 629.

13. Public L. 98–353, 98 Stat. 333 (July 10, 1984).

14. *Id.* § 430(c).

U.S.Code Cong. & Admin.News 1978, pp. 5787, 5825 [sic].[15]

### Section 327(e) of the Code

■ Section 327(e) of the Code provides:

(e) The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interests of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

This provision governs the hiring of "special counsel." Note that there is no "disinterestedness" requirement in Section 327(e) of the Code. Attorneys hired for a "specified special purpose" need not be disinterested. They need meet only the "no adverse interest" requirement.

### Section 1103(b) of the Code

In addition to Code Sections 327(a), (c), (d), and (e) and Bankruptcy Rule 2014, consideration must be given in Chapter 11 cases to Section 1103(b) in order to complete the picture of the law impacting on the issue of conflicts of interest. This section governs the allowance of fees for attorneys for creditors' committees; its provisions are similar to the laws governing the allowance of fees for attorneys for debtors in possession. Section 1103(b) reads as follows:

A person employed to represent a committee appointed under section 1102 of this title may not, while employed by such committee, represent any other entity in connection with the case.

The legislative history indicates that Section 1103(b) was intended to prevent potential conflicts of interest and to avoid the appearance of impropriety.[16]

The legislative history of the Code indicates that a conflict of interest is created whenever an attorney or law firm simultaneously represents both the creditors' committee and one or more individual creditors:

[T]he bill requires that counsel to the creditors' committee cease any representation of creditors in their individual capacities in connection with the case. . . . If the creditors on a committee split on a vote, the attorney for a particular creditor on the committee may be required to represent both the committee's position and his creditor-client's position, which may be directly contrary to the committee's position. . . . It does not require the attorney to cease representation of the creditors in matters unrelated to the case. It merely sets out a mandatory anticonflict of interest rule for each case.[17]

However, it has been held that "the role of counsel to an official creditors' committee is not adverse to, or in conflict with, the role of counsel to a bankruptcy trustee." [18]

15. *In re Smith*, 8 B.R. 699, at 700, 7 B.C.D. 302, 3 C.B.C.2d 795, Bank.L.Rep. (C.C.H.) ¶ 67823 (Bky.D.R.I.1981).

16. *See*, S.Rep. No. 95–989, 95th Cong., 2d Sess., 114 (1978), 1978 U.S.Code Cong. & Admin.News, p. 5787. The court in *In re Broadcast Management Corp.*, 36 B.R. 519, at 520, 11 B.C.D. 789, 10 C.B.C.2d 40 (Bky.S.D.Ohio 1983) stated:

The language of the section essentially states a *malum prohibitum* rule which allows for no exceptions. We agree with those courts which have refused to circumvent this straightforward provision. *See, In re Saxon Industries Inc.*, 29 B.R. 320, 10 B.C.D. 573 (Bkrtcy.S.D.N.Y.1983); *In re Combustion Equipment Associates, Inc.*, 8 B.R. 566 (Bkrtcy.S.D.N.Y.1981); *In re Proof of the Pudding, Inc.*, 3 B.R. 645 (Bkrtcy.S.D.N.Y.1980).

17. H.R.Rep. No. 95–595, 95th Cong., 1st Sess., 104–05 (1977), 1978 U.S.Code Cong. & Admin. News, pp. 5963, 6066.

18. *Matter of REA-Holding Corporation, et al.*, 2 B.R. 733, 734, 5 B.C.D. 1308 (S.D.N.Y.1980). *See also, In re Heatron, Inc.*, 5 B.R. 703, 705, 6 B.C.D. 883, 2 C.B.C.2d 1054 (Bky.W.D.Mo.1980), quoting *Dallas Cabana Inc. v. Collier*, 469 F.2d 606 (5th Cir.1972). *Cf. In re Mortgage Guarantee Co.*, 40 F.Supp. 226, 239 (D.Md.1941).

In the case of *Matter of CODESCO, Inc.*, 18 B.R. 997, 1000, 8 B.C.D. 1293, Bankr.L.Rep. (C.C.H.) ¶ 69178 (Bky.S.D.N.Y.1982), the court stated that though "it cannot be said categorically that the interests of counsel for the Creditor's Committee in the aborted Chapter 11 case and those of attorney for the trustee are in conflict," there is a potential conflict whenever an attorney

The 1103(b) restriction has been particularly offensive to commercial lawyers and there was much pressure placed upon Congress to amend this section.[19] As a result, the clear requirements of Section 1103(b), which apply in this case, must be understood in light of the 1984 Bankruptcy Amendments, which modified this Section to read:

An attorney or accountant employed to represent a committee appointed under Section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class represented by the committee shall not per se constitute the representation of an adverse interest.[20]

In cases filed after October 8, 1984, an attorney may represent both a creditors'

committee and any other entity that does not hold in the case an interest adverse to that of the committee. The amended provision further clarifies that the simultaneous representation of the committee and of creditors of the same class as those on the committee does not *per se* constitute the representation of a prohibited adverse interest. Attorneys will now be able to represent a committee as well as other entities in the case including individual creditors of the same class as those on the committee, unless a creditor objects on grounds that additional circumstances exist which create in those other entities or creditors an interest adverse to that of the committee.

## Section 1107(b) of the Code

Section 1107(b) reads:

---

represents both a committee and individual creditors. However, "the potential for conflicts of interest is eliminated by requiring counsel to discontinue representing a creditor during the continuance of the bankruptcy case."

**19.** The Commercial Law League of America sent the president of that organization to Washington to testify before the Subcommittee on Monopolies and Commercial Law of the U.S. House Judiciary Committee in support of H.R. 3949 which would amend Section 1103(b) of the Bankruptcy Code. President Ungerman urged the committee to change the section to make the prohibition applicable only in the rare instance when an adverse interest actually existed. He argued that the interests of the individual creditors and of the committee usually coincide. President Ungerman's testimony emphasized the problems the older section raised. The prohibition excludes from the representation of a creditor's committee those persons experienced and knowledgeable in the particular problems of the estate, i.e., the attorneys already representing creditors. As a result, it is often necessary for the creditors' committee either to employ counsel unfamiliar with the case or to proceed without counsel. Both alternatives result in delay and unnecessary expense.
The National Bankruptcy Conference was opposed to the amendments on grounds that any relaxation in the requirements would lead to impermissible conflicts of interest.
The amendments as set forth in Senate Bill 863 were passed on July 17, 1981 and sent to the House. 127 Cong.Rec. S 7893–7907 (July 17, 1981). The report accompanying the Senate Bill explained that Section 1103(b) was amended to permit the representation of an individual

creditor and also a creditors' committee in a bankruptcy proceeding if there existed no adverse interest. The report stated that the amendment could create a theoretical conflict of interest, but, in practice, implementation of the stringent standards of 1103(b) has meant significant hardship to creditors in retaining the best, most informed counsel. Experience has shown, stated the report, that in rural areas, the cure for the potential conflict has been at great cost and is in all likelihood worse than the disease.
Apparently, the House remained unimpressed with the Senate report because House Resolution 3705 was introduced, proposing alternative technical amendments. In the final vote, no provision was made for changes in 1103(b) at that time.
However, the very amendments voted down in 1982 were added to the amendment provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984. These identical amendments consisted of the following:
(1) inserting "having an adverse interest" after "entity," and
(2) adding at the end thereof the following: "Representation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest."
*In re Utah White Trucks*, No. 82M–01853, Transcript of Ruling (Bky.D.Utah, Jan. 18, 1983), *citing,* COMMERCIAL LAW JOURNAL, October 1981, pp. 367–70; 9 Bank.Serv.L.Ed. § 81:6 (Supplement p. 5–7) (April 1982).

**20.** *See e.g., In re Itel Corporation,* BN 308100111 LK (Bky.N.D.Cal. April 20, 1984).

(b) Notwithstanding section 327(a) of this title, a person is not disqualified for employment under Section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

This section was left unamended by the 1984 Bankruptcy Amendments.

Section 1107(b) was not intended to operate as "a blanket exception to the requirements of Section 327(a) or to make the disinterested person standard inapplicable...." [21] Instead:

> Congress deliberately chose to place both constraints on the debtor in possession when it enacted the new Code (under Bankruptcy Rule 215 only the adverse interest standard was applied for disqualification of an attorney for the debtor in possession under the old Bankruptcy Act ...). Therefore, it seems that Congressional intent is clear: that the disinterested standard as well as the adverse interest standard is to be applied in evaluating the employment of professionals by a debtor in possession pursuant to § 327(a), subject to the narrow exception drawn by § 1107(b). [22]

█ Thus, when the debtor in possession seeks to hire an attorney pursuant to Section 1107(b), that attorney must meet both the "disinterestedness" and the "no adverse interest" standards, even though that section makes expressly clear that the mere prior representation of the debtor by the attorney seeking employment will not disqualify him for employment. [23]

The court stated in *In re Heatron:*

> The language of section 327(b), when taken with the proviso in Section 1107(b), creates a distinction between the hiring of an attorney as representative of the trustee generally and the hiring of an

attorney to assist in the operation of the business. [24]

## Definitions of Terms Related to Section 327 of the Code

With these provisions in mind, the Court will now set forth in this opinion its own definitions for certain undefined words and phrases which are found in Section 327(a) and which are essential to a full determination of the issues in this case.

█ The phrase, "an interest" is not defined in the Code; nor is it illuminated in the Code's legislative history. However, from the various contexts in which the phrase is used in Section 327, it is the opinion of this Court that the term "interest" was primarily used there in its broad commercial and economic sense to mean any property (real or personal), money, credit, service, benefit, entitlement, right, expectation, claim, or value in any form, whether vested or unvested, contingent or noncontingent, liquidated or unliquidated, disputed or undisputed, to which the divided or undivided right or title of any holder thereof may attach under any foreign or domestic constitution, statute, ordinance, rule of common law, regulation, treaty, contract, or custom. In addition to the economic interest defined above, the term "interest" as used in Section 327(a) could, depending upon the circumstances of a given case, also refer to the predisposition that is ordinarily created by family ties, friendship, and by fiduciary or official responsibilities.

To "hold" such an "interest" means to possess or assert a claim to such right or title or to possess such a predisposition as defined above.

█ To "hold an adverse interest" means for two or more entities (1) to possess or assert mutually exclusive claims to

**21.** *In re Leisure Dynamics, supra,* 32 B.R. at 755.

**22.** *Id.*

**23.** *Id.* at 754–56. *See also, In re Hempstead Realty Associates, Inc.,* 34 B.R. 624, at 625–26 (Bky.S.D.N.Y.1983); *In re Tashof,* 33 B.R. 225,

at 227, 10 B.C.D. 1452 (Bky.D.Md.1983); and *In re Sambo's Restaurants, Inc.,* 20 B.R. 295, at 297–98 (Bky.C.D.Cal.1982).

**24.** *In re Heatron, Inc.,* 5 B.R. 703, 705 (Bky.W.D. Mo.1980).

the same economic interest, thus creating either an actual or potential dispute between the rival claimants as to which, if any, of them the disputed right or title to the interest in question attaches under valid and applicable law; or (2) to possess a predisposition or interest under circumstances that render such a bias in favor of or against one of the entities.

 To "hold an interest adverse to the estate" means (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

 To "represent an adverse interest" means to serve as agent or attorney for any individual or entity holding such an adverse interest. In the case of *In re Harry Fondiller*, the court stated:

> We interpret that part of § 327(a) which reads that attorneys for the trustee may "not hold or represent an interest adverse to the estate" to mean that the attorney must not represent an adverse interest relating to the services which are to be performed by that attorney.[25]

With this qualifying language, this Court concurs.

 A "conflict of interests," as usually applied to an attorney, refers to the representation by a given attorney or law firm of two or more entities holding or claiming adverse interests or of an entity holding an interest adverse to that of its attorney, its attorney's firm or the firm's associates.

## Definition of "Disinterested Person:" Section 101(13)

The phrase "disinterested person," is defined in Section 101(13) of the Code:

(13) "disinterested person" means person that—

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;

(C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale or issuance of a security of the debtor;

(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason; ...

In the case of *In re O.P.M. Leasing Services, Inc.* the court explained:

> The definition of "disinterested person" is adapted from Section 158 of Chapter X of the Bankruptcy Act of 1898, 11 U.S.C. § 558 (1976 ed.). H.R. Rep. No. 595, 95th Cong., 1st Sess. 310–11 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 23 (1978), U.S.Code Cong. & Admin. News, p. 5787. Bankruptcy Rule 10–202(c)(2), which also contains guidelines for disinterestedness, is likewise derived from Section 158. *See* Advisory Committee's Notes to Rule 10–202. Though 11 U.S.C. § 101(13) expands and modifies in some respects its antecedents, ... those changes do not affect the vitality of

---

**25.** *In re Harry Fondiller,* 15 B.R. 890, at 892, 8 B.C.D. 532, 5 C.B.C.2d 1134, Bankr.L.Rep.

(C.C.H.) ¶ 68519 (Bky.App.Pan. 9th Cir.1981).

those cases decided under the prior law (the statute or rule) that address the issues within.[26]

Section 101(13) is not the best example of clear draftsmanship.[27] This Court has noted that there

> ... is something of a redundancy in ... the Code's definition in Section 101(13) of a disinterested person [which definition] requires, among other things, that such person ... not have an interest materially adverse to the interest of the estate or of any class of creditors or equity holders by reason of any direct or indirect relationship to, connection with, or interest in the debtor or for any reason.[28]

In its discussion of the term "disinterested person" as defined in the Bankruptcy Reform Act of 1978, COLLIER states:

> The enunciated elements provide a minimum standard for the guidance of the court in its appointments, and insure that the persons employed shall have the essential character of independence and disinterestedness which is required. These elements do not, however, establish an exclusive standard. As was the case under pre-Code bankruptcy practice, (continued by virtue of the "catchall" provision of clause (E)), if a court deems a particular person's associations to be prejudicial to disinterestedness, it may reject him even though those associations do not come strictly within the purview of section 101(13). Thus, the phrase "or for any other reason" permits the court to find a particular person lacking in disinterestedness for reasons other than the non-exclusive statutory guidelines.
>
> As noted above, clause (E) may be termed a "catch-all clause," and it seems broad enough to include anyone who in the slightest degree might have some interest or relationship that would even faintly color the independent and impartial attitude required by the Code and Bankruptcy Rules. The reasons supporting this extensive inclusion are the same, of course, as those previously recounted. Indirect or remote, as well as direct, associations or affiliations may engender conflicting loyalties.

> . . . . .

It is clear, therefore, that the definition of disinterested person in paragraph (13) promotes the policy that as a general principle professionals engaged in the conduct of a bankruptcy case should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degree of impartiality and detached judgment expected of them during the course of administration.

---

26. *In re O.P.M. Leasing Services, Inc.,* 16 B.R. 932, at 937, 8 B.C.D. 841, 5 C.B.C.2d 1503 (Bky. S.D.N.Y.1982).

The court in *In re Philadelphia Athletic Club, Inc.,* 20 B.R. 328, at 333–334 (E.D.Pa.1982), later proceedings, 38 B.R. 882 (Bky.E.D.Pa.1984), stated:

> The definition of "disinterested person" found in the Bankruptcy Reform Act of 1978 "is basically adapted, with some expansion and modification, from Section 158 of Chapter X (corporate reorganization) of the Bankruptcy Act of 1898 and Bankruptcy Rules which were in effect prior to the adoption of the Code." 1 Collier Bankruptcy Manual § 101.13 (1981). In cases decided under that law, the courts held that the tests of disinterestedness were to be rigidly applied and could not be waived because of the integrity or ability of the particular person involved. *See e.g. Meredith v. Thralls,* 144 F.2d 473, 475 (2d Cir.), *cert. denied,* 323 U.S. 758, 65 S.Ct. 92, 89 L.Ed. 607 (1944); 1 Collier Bankruptcy Manual § 1011.-13 (1981).
> Under the Act of 1898, a trustee in a corporate reorganization proceeding had to be "independent and disinterested so far as possible." *In re Ocean City Automobile Bridge Co.,* 184 F.2d 726, 729 (3rd Cir.1950). He had to "be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." *In re Realty Associates Securities Corp.,* 56 F.Supp. 1007, (E.D.N.Y.1944). The attorney for the trustee had to exercise the same degree of disinterestedness as the trustee himself. 6 Collier on Bankruptcy § 7.06 at 1203 (14th ed. 1974). "This, of course, ... [was] quite sensible, for it would be anomalous indeed to require a trustee to be aloof from all connection with the debtor or its management, yet permit the trustee's attorney, who would necessarily be active in furthering the trustee's duties of investigation, management, prosecution, development of plans and the like, to have a close relationship with the debtor, its management or associates." *Id.* Accordingly, it had been held that a debtor's attorney was not eligible for appointment as a "disinterested" attorney for the trustee, *In re Progress Lektro Shave Corp.,* 117 F.2d 602 (2d Cir.1941), nor was an attorney who had represented a stockholder of the debtor eligible to serve as the trustee's counsel. *In re Chicago Rapid Transit Co.,* 93 F.2d 832 (7th Cir.1937). *See generally,* Annot., 79 A.L.R.2d 759 (1961).

27. *See, Matter of the Cropper Company, Inc., supra,* 35 B.R. at 629.

28. *In re Arden Spencer Howard, supra,* n. 11, at 2.

In the face of the imperfections in the language of Section 101(13), the *Cropper* court concluded that this section

is a guideline for the Court to follow in exercising its sound judicial discretion to "insure that persons employed shall have the essential character of independence and disinterestedness which is required." *In re Philadelphia Athletic Club, Inc.,* 20 B.R. 328, 333 (E.D.Pa.1982).[29]

The court in the case of *In re Sambo's Restaurants,* stated:

Bankruptcy Code section 101(13)(E) was adopted from Bankruptcy Rule 10–202(c)(2)(D). "It appears broad enough to include anyone who in the slightest degree might have some interest or relationship that would color the independent and impartial attitude required by the Code." 2 Collier on Bankruptcy Para. 327.03[f], p. 327–16 (15th Ed.1981). The purpose of the rule is to prevent a conflict without regard to the person's integrity. Conflicting loyalties may arise even from remote or indirect associations. 2 Collier Para. 327.03[f]. The goal should be not to prevent actual evil in this particular case, but the tendency to evil in all cases.[30]

In attempting to interpret Section 101(13), the court in *In re Harry Fondiller,* wrongly concluded that attorneys for creditors were disinterested persons for the reason that:

While creditors are specifically named as "not disinterested" by § 101(13)(A), attorneys for creditors are not. The only attorneys specifically noted as "not disinterested" by this section are those who have represented certain investment bankers involved in the securities of the debtor.[31]

The implication of this statement is that the Section 101(13) list of "disinterested" persons is exhaustive. But this is not true.

The Advisory Committee's Note to Rule 10–202(c)(2), from which Section 101(13) is derived, makes it clear that the "statutory guidelines for determination of disinterestedness were not exclusive. The court on other bases might find a person lacking in disinterestedness." [32]

In *Matter of CODESCO,* the court "on other bases" did find just such a lack of "disinterestedness." In doing so, the court relied upon the "elastic clause" of Section 101(13):

Since the ... [law] firm is not disqualified by any of the specific relationships delineated under 11 U.S.C. § 101(13), [the objecting party] predicates its objection to the trustee's retention of the ... firm on the catch all clause "or for any other reason." ... There is no question that the purpose of the incorporation of the disinterest requirements in 11 U.S.C. § 327 was to prevent even the appearance of a conflict irrespective of the integrity of the person or firm under consideration. Certainly a "disinterested" person should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters. *In re Realty Associates Securities Corporation,* 56 F.Supp. 1007 (D.C.E.D.N.Y.1944).[33]

### Applicable Canons of Ethics and Disciplinary Rules

Numerous cases have been reported in which courts have reduced or denied attorneys fees in bankruptcy cases and proceedings on grounds that the attorney or law firm seeking payment

(1) was not disinterested within the meaning of 11 U.S.C. Section 327(a) and 101(13); or

(2) held an adverse interest within the meaning of 11 U.S.C. Section 327(a); or

**29.** *Matter of the Cropper Company, Inc., supra,* 35 B.R. at 629.

**30.** *In re Sambo's Restaurants, Inc., supra,* 20 B.R. at 297.

**31.** *In re Harry Fondiller, supra,* 15 B.R. at 891.

**32.** *In re Sambo's Restaurants, Inc., supra,* 20 B.R. at 297. *See also,* n. 22, *supra.*

**33.** *Matter of CODESCO, Inc., supra,* 18 B.R. at 999.

(3) represented an adverse interest within the meaning of 11 U.S.C. Section 327(a); or

(4) was involved in a prohibited conflict of interests contrary to the ethical standards set out in the Code of Professional Responsibility.

In this case, the Court must determine whether or not the firm of ROE & FOWLER was involved in a conflict of interest prohibited by bankruptcy law and/or by the canons of ethics and disciplinary rules of the pertinent Codes of Professional Responsibility, as those laws, canons, and rules apply in this case.

In order to make this determination, the Court must set out the legal provisions that make certain canons of ethics and disciplinary rules binding upon attorneys practicing before this Court.

**How the Ethical Standards of the Utah and ABA Codes of Professional Responsibility Become Binding Upon Practitioners Appearing Before This Court.** The United States Constitution, Art. I, Section 1, provides:

All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives.

By an Act, dated May 8, 1792 (1 STAT. 275, 276), the United States Congress delegated to the federal courts the power to establish rules of practice, provided that such rules were not repugnant to the laws of the United States. Early in this country's history, the power of Congress to delegate its legislative authority to the courts was challenged in the case of *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 6 L.Ed. 253 (1825). Chief Justice John Marshall agreed that the rule-making power was a legislative function and the Congress could have formulated the rules itself, but he denied that the delegation was impermissible. Since that decision, Congress has authorized the United States Supreme Court to prescribe rules of procedure for the lower federal courts. This Congressional authorization now appears at 28 U.S.C. Section 2072, which provides:

The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure of the district courts and courts of appeals of the United States in civil actions, including admiralty and maritime cases, and appeals therein, and the practice and procedure in proceedings for the review by the courts of appeals of decisions of the Tax Court of the United States and for the judicial review or enforcement of orders of administrative agencies, boards, commissions, and officers.

Such rules shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution.

Such rules shall not take effect until they have been reported to Congress by the Chief Justice at or after the beginning of a regular session thereof but not later than the first day of May, and until the expiration of ninety days after they have been thus reported.

All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect. Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court.

Pursuant to this provision and its historical antecedents, the United States Supreme Court, vested and charged with the rule-making power promulgated the Federal Rules of Civil Procedure, effective on September 1, 1938 and amended as recently as 1984.

Rule 83 of the Federal Rules of Civil Procedure provides:

Each district court by action of a majority of the judges thereof may from time to time make and amend rules governing its practice not inconsistent with these rules.

Pursuant to this rule, the United States District Court for the District of Utah pro-

mulgated, on February 1, 1980, certain local rules known as "The Civil Rules of Practice of the United States District Court for the District of Utah." Rule 1(g) of these rules provides:

> The standards of conduct of the members of the bar of this court, of non-resident government attorneys and of non-resident attorneys admitted to practice before this court in a particular case shall be those prescribed by the Utah Code of Professional Responsibility and amendments thereto and revisions thereof and by the Code of Professional Responsibility approved by the Judicial Conference of the United States.

Thus, by this chain of constitutional provisions, Congressional statutes, and court rules, attorneys in Utah practicing before the United States District Court (and the Bankruptcy Court as a unit of that court) are subject to certain ethical canons and disciplinary rules that prohibit the representation of conflicts of interest.

But this is not all. There is another legal chain that must be considered.

Pursuant to the United States Constitution, Art. I, Section 1, Congress enacted 28 U.S.C. § 2071, which provides:

> The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business.
>
> Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed by the Supreme Court.

Pursuant to this provision, the United States District Court for the District of Utah promulgated its local rules of practice, including Rule 1(g), mentioned above.

Moreover, this provision also empowers the United States Bankruptcy Court for the District of Utah—a court established by the Acts of Congress known as "Title 11 of the Bankruptcy Reform Act of 1978" as later amended by the 1984 Bankruptcy Amendments—to promulgate its "Rules of Practice of the United States Bankruptcy Court for the District of Utah," most recently amended as of February 17, 1984. Rule 1(g) of these local bankruptcy rules provides that:

> The standards of conduct of members of the bar of this court and of non-resident attorneys admitted to practice before this court in a particular case shall be those of the Utah Code of Professional Responsibility and amendments thereto and revisions thereof and by the Code of Professional Responsibility approved by the Judicial Conference of the United States.

There is yet another chain of law that binds attorneys practicing before this Court to Professional Responsibility Codes of both Utah and as approved by the Judicial Conference of the United States.

Pursuant to the United States Constitution, Art. I, Section 1, Congress enacted 28 U.S.C. Section 2075, which provides that:

> The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under title 11 [11 U.S.C. Section 1, et seq.].

Pursuant to this statute, the United States Supreme Court promulgated the "Rules and Forms of Practice and Procedure in Bankruptcy" ("Bankruptcy Rules") which became effective on August 1, 1983. Rule 9029 of these Bankruptcy Rules provides:

> Each bankruptcy court by action of a majority of the judges thereof may make and amend rules governing its practice and procedure not inconsistent with these rules.

Since the decision of the U.S. Supreme Court in the *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598, 9 B.C.D. 67, 6 C.B.C.2d 785, Bankr.L.Rep. (C.C.H.) ¶ 68698 (1982), which struck down certain jurisdictional provisions of the "Bankruptcy Reform Act of 1978" and since the enactment of the 1984 Bankruptcy Amendments, it is no longer clear whether Rule 9029 of the Bankruptcy Rules can, consistent with the provisions of

the new jurisdictional amendments, empower bankruptcy judges to promulgate rules of practice for bankruptcy courts. Nevertheless, as stated above, it is clear that bankruptcy judges, as judges of courts established by Act of Congress, have power to promulgate such local rules under the authority granted by 28 U.S.C. Section 2071.

■ Therefore, by at least two, and possibly three, chains of law, attorneys practicing before this Court are "held to the same ethical standards as are other counsel." [34] This requires that in this district and in this Court legal work be done in accordance with both the Utah Code of Professional Responsibility and the ABA's Code of Professional Responsibility, as approved by the United States Judicial Conference. [35]

Since both the Utah District Court and the Utah Bankruptcy Court have promulgated local rules that incorporate by reference the Utah Code of Professional Responsibility, it is important to understand the contents of that Code and the legal chain that makes it binding upon the attorneys practicing in Utah.

The Utah Code of Professional Responsibility attains the status of law through the following provisions and statutes, beginning with the Utah Constitution, Art. VIII, Section 1, which provides that:

The Judicial power of the State shall be vested in the Senate sitting as a court of impeachment, in a Supreme Court, in district courts, in justices of the peace, and such other courts inferior to the Supreme Court as may be established by law.

The Supreme Court of the State of Utah has held that inherent in the judicial power referred to in this provision of the State constitution "is the power to regulate the practice of law." [36]

It was by virtue of this "inherent power" that the Utah Supreme Court, on May 28, 1936, approved its Rules of Professional Conduct of the Utah State Bar, which were adopted on March 1, 1937, and which consisted of three rules. Rule I made all rules of professional conduct promulgated by the Supreme Court of Utah binding on all Utah attorneys pursuant to the court's inherent power "to control and supervise the conduct of members of the Utah State Bar." Rule II sets forth the duty of Utah attorneys. Rule III contained the Utah attorneys' oath.

On February 19, 1971, the Utah Supreme Court approved the adoption of Rule IV of the Rules of Professional Conduct of the Utah State Bar. Rule IV incorporated by reference all the canons of ethics, ethical considerations, and disciplinary rules set out in the American Bar Association's Model Code of Professional Responsibility. Since its adoption, Rule IV has been updated and amended by the Utah Supreme Court from time to time. [37]

The Utah Code of Professional Responsibility, except for those provisions governing attorney advertising and certain other unrelated provisions, is virtually identical in content to the ABA's Code of Professional Responsibility, as approved by the Judicial Conference of the United States. With regard to the canons of ethics and disciplinary rules controlling in this case, the two Codes are identical. Both "attempt to define and promulgate minimum standards which attorneys must meet in rendering

**34.** *In re Arden Spencer Howard, supra,* n. 11, at 2–3.

**35.** See, *Brennan's Inc. v. Brennan's Restaurant, Inc.,* 590 F.2d 168, 172 n. 15 (5th Cir.1979); *Woods v. Covington County Bank,* 537 F.2d 804, at 810 (5th Cir.1976); *Kraft, Inc. v. Alton Box Board Co., (In re Corrugated Container Antitrust Litigation),* 659 F.2d 1341, at 1349 (5th Cir. 1981); *In re Philadelphia Athletic Club, Inc., supra,* 20 B.R. at 335.

**36.** *In re Utah State Bar Petition for Approval of Changes in Disciplinary Rules on Advertising,* 647 P.2d 991, at 999 (Utah 1982). *See also, In re Integration and Governance of the Utah State Bar,* 632 P.2d 845 (Utah 1981).

**37.** *See, e.g., In re Utah State Bar Petition for Approval of Changes in Disciplinary Rules on Advertising,* 647 P.2d 991 (Utah 1982).

services to the public."[38] They "define the type of ethical conduct that the public has a right to expect not only of lawyers but also of their non-professional employees and associates in all matters pertaining to professional employment."[39]

**What Provisions of the Utah and ABA Codes of Professional Responsibility Apply in this Case.** The canons of ethics, found in both the Utah and the approved ABA Codes of Professional Responsibility, that are applicable in this case, are set forth and discussed below:

### Canon 1

Canon 1 states that "a lawyer should assist in maintaining the integrity and competence of the legal profession." Specifically, Disciplinary Rule 1–102, entitled "Misconduct," provides that:

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

... [or]

(5) Engage in conduct that is prejudicial to the administration of justice.

### Canon 4

Canon 4 states that "a lawyer should preserve the confidences and secrets of a client." "[T]he Fifth Circuit recognized the principle that attorneys have an obligation not to use information acquired in the course of representation of a client to that client's disadvantage."[40] Ethical Consideration 4–5 states:

A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes. Likewise, a lawyer should be diligent in his efforts to prevent the misuse of such information by his employees and associates. Care should be exercised by a lawyer to prevent the disclosure of the confidences and secrets of one client to another, and no employment should be accepted that might require such disclosure.

The court in *Matter of Davis*, stated that:

Canon 4 prevents a lawyer from representing a client in a legal action against one of his former clients where there is a substantial relationship between the two representations. [*In re Corrugated Container Antitrust Litigation,*] *Kraft Inc.*, 659 F.2d [1341] at 1344; *Paro v. Tetzlaff (In re Tetzlaff)*, 31 B.R. 560, 562 (Bankr.E.D.Wisc.1983); *Ludwig v. Coldwell, Banker & Co., (In re Barton & Ludwig )*, 9 B.R. 222, 224 (Bankr.N.D.Ga. 1981). To be substantially related to a pending action, the prior legal representation "need only be akin to the present action in a way reasonable persons would understand as important to the issues involved." *Kraft, Inc.*, 659 F.2d at 1346. If a substantial relationship is found, a conclusive presumption arises that confidential information has been given to the attorney. *Id.* at 1347. Under the substantial relationship test, doubts on the existence of a conflict of interest should be resolved in favor of disqualification. *In re Whitney-Forbes, Inc.*, 31 B.R. 836 (Bankr.N.D.Ill.1983).[41]

### Canon 5

Canon 5 states that "a lawyer should exercise professional judgment on behalf of

---

**38.** *In re Smith,* 5 B.R. 92, 98, 6 B.C.D. 506, 2 C.B.C.2d 481 (Bky.D.C.1980), *aff'd in part and rev'd in part, In re Devers,* 12 B.R. 140, 7 B.C.D. 277, 5 C.B.C.2d 595, Bankr.L.Rep. (C.C.H.) ¶ 67861 (D.D.C.1981), *on remand, In re Smith,* 24 B.R. 266 (Bky.D.C.1982), *aff'd in part and remanded in part In re Devers,* 33 B.R. 793, Bankr.L.Rep. (C.C.H.) ¶ 69293 (D.D.C.1983), *app. dismissed without opinion, In re Devers,* 729 F.2d 863 (D.C.Cir.1984).

**39.** Code of Professional Responsibility and Opinions of the D.C. Bar Legal Ethics Committee, p. 1M (1976), *quoted in, In re Smith, supra,* 5 B.R. at 98.

**40.** *Matter of Barton & Ludwig,* 9 B.R. 222, at 224, 7 B.C.D. 378 (Bky.N.D.Ga.1981).

**41.** *Matter of Davis,* 40 B.R. 163, at 165–166, 11 C.B.C.2d 43 (Bky.M.D.Ga.1984). *See also, Matter of Market Response Group, Inc.,* 20 B.R. 151, at 153, 9 B.C.D. 42, 6 C.B.C.2d 685 (Bky.E.D. Mich.1982).

a client." Moreover, Disciplinary Rule 5–105 entitled "Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independence and Professional Judgment of the Lawyer," specifically states:

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR–5–105(C).

. . . . . .

(C) In the situations covered by DR–5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

Moreover,

Ethical Considerations 5–1 and 5–14 of the American Bar Association's Code of Professional Responsibility provide that the professional judgment of a lawyer must be exercised solely for the benefit of this client, free of compromising influences and loyalties, and this precludes his acceptance of employment that will adversely affect his judgment or dilute his loyalty.[42]

Additionally, Ethical Consideration 5–15 provides that:

If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues employment. He should resolve all doubts against the propriety of the representation.

"[W]ith rare and conditional exceptions, the lawyer may not place himself in a position where a conflicting interest may, even inadvertently, affect, or give the appearance of affecting, the obligations of the professional relationship." [43]

"The interests of any other person should not affect an attorney's basic judgment and responsibility to his client." [44] "An attorney should not place himself in a position where he may be required to choose between conflicting duties." [45] In the *Newhouse Realty Co.* case, the Utah Supreme Court stated:

The rule that an attorney may not by his contract of employment place himself in a position where his own interests or the interest of another, whom he represents, conflict with the interests of his client, is founded upon principles of public policy. It is designed to serve various purposes, among them, to prevent the dishonest practitioner from fraudulent conduct, to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties or between his own interests and those of his client, to remove from the attorney any temptation which may tend to cause him to deviate from his duty of enforcing to the full extent the right of this client, to further the orderly administration of justice, and to foster respect for the profession and the courts.[46]

---

**42.** *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, at 1386 (2d Cir.1976); *see also, Matter of Allied Artists Pictures Corp.,* 17 B.R. 288, at 291 (Bky.S.D.N.Y.1982).

**43.** *Matter of Kelly,* 23 N.Y.2d 368, at 376, 296 N.Y.S.2d 937, 244 N.E.2d 456 (1968).

**44.** *In re 765 Associates,* 14 B.R. 449, at 451, 8 B.C.D. 200 (Bky.D.Haw.1981).

**45.** *Id.* at 451. *See also, Woods v. City National Bank & Trust Co. of Chicago,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820, *reh. den.,* 312 U.S. 715, 61 S.Ct. 736, 85 L.Ed. 1145 (1941); *In re Westmoreland,* 270 F.Supp. 408 (M.D.Ga.1967); *Margulies v. Upchurch,* 696 P.2d 1195 (Utah 1985); *In re Buder,* 358 Mo. 796, 217 S.W.2d 563 (1949); *Gillette v. Newhouse Realty Co.,* 75 Utah 13, 282 P. 776 (1929).

**46.** *Gillette v. Newhouse Realty Co., supra,* 282 P. at 779, *quoted in In re 765 Associates, supra,* 14 B.R. at 451.

"The spirit of the Bankruptcy Act [was] entirely consistent with these policies." [47] More to the point:

The spirit of the Bankruptcy Code is entirely consistent with this policy. Mr. Justice Douglas, who was particularly cognizant of the applicable principles in bankruptcy cases, said, in *Woods v. City National Bank & Trust Co. of Chicago*, 312 U.S. 262, 269, 61 S.Ct. 493 [497], 85 L.Ed. 820, [*rehearing denied, Woods v. City National Bank & Trust Co. of Chicago*, 312 U.S. 715, 61 S.Ct. 736, 85 L.Ed. 1145 (1941)]:

A fiduciary who represents security holders in a reorganization may not perfect his claim to compensation by insisting that although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one. Only strict adherence to these equitable principles can keep the standard of conduct for fiduciaries 'at a level higher than that trodden by the crowd.' *See*, Justice Cardozo in *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 62 A.L.R. 1.[48]

### Canon 6

Canon 6 states that "a lawyer should represent a client competently." Disciplinary Rule 6–101, entitled "Failing to Act Competently," states:

(A) A lawyer shall not:

(1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.

(2) Handle a legal matter without preparation adequate in the circumstances.

### Canon 9

Canon 9 states that "a lawyer should avoid even the appearance of professional impropriety."

[T]he bar has an independent interest in avoiding even the appearance of impropriety, and that interest mandates a clear margin of protection against potentially conflicting arrangements.... Accordingly, any doubt in the disqualification situation is to be resolved in favor of disqualification." [49]

In *In re Perry, Adams, & Lewis Securities, Inc.*, [50] the court, quoting *In re Chicago Rapid Transit Co.*,[51] stated:

It becomes the duty of the trustee and of his attorneys not only to be impartial and free from the influence of any secured holder, but the other security holders must have faith and confidence in their impartiality and independence.[52]

And the court in *Matter of CODESCO*, stated:

Although it is stated in John, 7:24 "Judge not according to the appearance," heed must be given to Hamlet's admonition to Rosencrantz: "There is nothing either good or bad, but thinking makes it so." Hamlet, II, ii, 259. Thus, Canon 9 of the American Bar Association's Code

47. *In re Philadelphia Athletic Club, Inc., supra,* 20 B.R. at 336.

48. *Matter of CODESCO, Inc., supra,* 18 B.R. at 1000. For additional glosses on the case of *Woods v. City National Bank & Trust Company of Chicago, supra,* 312 U.S. 262, 61 S.Ct. 493, see the following cases: *Matter of REA Holding Corporation, et al., supra,* 2 B.R. 733; *Matter of Perry, Adams & Lewis Securities, Inc.,* 5 B.R. 63 (Bky.W.D.Mo.1980). *In re Cottontree Inn Associates, supra; In re American Tierra,* No. 81M–03073, Transcript of Ruling at 7–8 (Bky.D.Utah, June 8, 1983) (J. Mabey); *In re Chou-Chen Chemicals, Inc.,* 31 B.R. 842, 10 B.C.D. 1103, 8 C.B.C.2d 1240 (Bky.W.D.Ky.1983); *In re B.E.T.*

*Genetics, Inc.,* 35 B.R. 269, 11 B.C.D. 845, 9 C.B.C.2d 1346 (Bky.E.D.Cal.1983).

49. *Glueck v. Jonathan Logan, Inc.,* 512 F.Supp. 223, at 228 (S.D.N.Y.1981), *aff'd,* 653 F.2d 746 (2d Cir.1981). *See also, Hull v. Celanese Corp.,* 513 F.2d 568, at 571 (2d Cir.1975).

50. *In re Perry, Adams & Lewis Securities, Inc., supra,* 5 B.R. at 65.

51. *In re Chicago Rapid Transit Co.,* 93 F.2d 832, at 838 (7th Cir.1937).

52. *In re Perry, Adams & Lewis Securities, Inc., supra,* 5 B.R. at 65.

of Professional Responsibility states that a lawyer should avoid even the appearance of professional impropriety.[53]

The spirit of the *CODESCO* court's teaching is reminiscent of the admonition of St. Paul to "abstain from all appearance of evil." [54] In applying this Canon of Ethics the court in *In re Philadelphia Athletic Club, Inc.*, stated:

The [Third Circuit] Court of Appeals has held that in applying Canon 9, a court "must view the conduct as an informed and concerned private citizen and judge whether the reputation of the Bar would be lowered if the conduct were permitted." *United States v. Miller*, 624 F.2d 1198, 1202 (3d Cir.1980). A court should also consider any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions. *Id.* at 1203. *See generally*, Kramer, *The Appearance of Impropriety Under Canon 9: A Study of the Federal Judicial Process Applied to Lawyers*, 65 MINN.L.REV. 243 (1980).[55]

Under the Code of Professional Responsibility, there is, at present, no specific Canon dealing with a conflict caused by an attorney's representation of an interest adverse to that of a former client. Conflicts with former clients have been treated as violations of Canons 4 or 9.[56] When such a conflict arises, the offending attorney is usually held to a standard less strict than that applied in cases where the attorney represents an interest adverse to an existing client.[57]

The court in *In re Pacific Homes* stated:

The courts have held that a party seeking to disqualify its former counsel from continuing to appear in an adversary proceeding against the former client needs to show (1) the former representation;

(2) substantial relation between the subject matter of the former representation and the issues in the later lawsuit; and (3) the later adverse representation. *E.F. Hutton & Company v. Brown*, 305 F.Supp. 371, 394 (S.D.Tex.1969); *Marketti v. Fitzsimmons*, 373 F.Supp. 637, 639 (W.D.Wis.1974); *First Wisconsin Corporation*, 422 F.Supp. 493, 496 (E.D.Wis. 1976).[58]

## The New Model Code of Professional Responsibility

On August 2, 1983, the American Bar Association's House of Delegates adopted a new code of professional responsibility, entitled "Model Rules of Professional Conduct" ("Rules of Conduct"). The Utah State Bar will soon consider recommending that these Rules, with perhaps slight revisions, be sent to the Utah State Supreme Court for adoption as part of the Rules of Professional Conduct of the Utah State Bar, in place of the present Utah Code of Professional Responsibility. The ABA's Model Rules of Conduct may also be adopted by the United States Judicial Conference and, thereby, become binding upon attorneys practicing in federal courts.

It is difficult to ascertain the precise effect these new rules will have upon practice in bankruptcy courts, if and when they are adopted. But, in the opinion of this Court, it is doubtful whether this impact will be very great. This view is predicated on the fact that the Bankruptcy Code and Rules contain their own anticonflict provisions and that much of the bankruptcy case law on this subject constitutes judicial gloss on those provisions, independent of any requirements set forth in the Code of Professional Responsibility. Moreover, the new Rules of Conduct do not greatly alter

---

**53.** *Matter of CODESCO, Inc., supra*, 18 B.R. at 1000.

**54.** II Thess. 5:22.

**55.** *In re Philadelphia Athletic Club, Inc., supra*, 20 B.R. at 335.

**56.** *See text* at n. 41, *supra*.

**57.** *Glueck v. Jonathan Logan, Inc., supra*, 512 F.Supp. at 228. *See also, Cinema 5, Ltd. v. Cinerama, Inc., supra*, 528 F.2d 1384; and *Matter of Allied Pictures Corp., supra*, 17 B.R. 288.

**58.** *In re Pacific Homes*, 1 B.R. 574, at 582, 5 B.C.D. 1149 (Bky.C.D.Cal.1979).

the present law on conflicts of interest as that law has developed in recent years. Finally, the new Rules of Conduct, by and large, attempt only (1) to codify these existing decisions, (2) to delineate areas of conflict left vague or unstated in the present canons, ethical considerations, and disciplinary rules, but treated in interpreting case law, and (3) to clarify and specify common attorney conflict situations.

Under the Code of Professional Responsibility, attorney conflicts of interest were not expressly prohibited by any particular canon, but by a variety of disciplinary rules and ethical considerations derived from a number of canons, particularly Canons 1, 4, 5, 6, and 9. Under the new Rules of Conduct, conflicts of interest will be expressly designated and prohibited in Rule 1.7 (the general rule), Rule 1.8 (prohibited transactions), and Rule 1.9 (former client). These prohibitions will also be effected by the requirements of other new rules, such as Rule 1.6 (confidentiality of information), Rule 1.10 (imputed disqualification), Rule 1.13 (organizational client), Rule 1.16 (declining or terminating representation), and Rule 5.4 (professional independence of a lawyer).

It is doubtful that there will be more conflicts of interests under the new Rules of Conduct than exist now, because (1) the new rules often allow an attorney to engage in otherwise prohibited representation if the attorney has obtained the permission, after consultation, of the adversely effected client and (2), with the exception of Rule 1.9 (former client) not covered expressly in the present Code of Professional Responsibility, the new Rules of Conduct do not attempt to delineate major new areas of conflict heretofore not treated under the present disciplinary rules or under the case law generated in opinions treating these rules.

In anticipation of the impact which the new Rules of Conduct will have upon conflicts cases and upon attorneys and judges, the drafters included in their Comments on each new rule a section entitled "Code Comparison," which contrasts and compares the given new rule with the provisions of the disciplinary rules from which the new rule was derived or upon which it was patterned. These sections are very helpful in ascertaining what impact the new provisions will have, and this Court has relied upon them heavily in setting forth these remarks.

## ANALYSIS OF CONFLICTS OF INTEREST

**Policy**

▇ Taken together, the provisions of Sections 327(a) and 101(13) and Canons 1, 4, 5, 6, and 9, of the present Codes of Professional Responsibility prohibit attorneys practicing before this Court from representing conflicting interests. This prohibition is not new. The court, in *In re Paine*, noted that

It was established at common law by the Seventeenth Century that an attorney must not represent opposing interests. *Shire v. King*, Yelverton 32, Anonymous 7, Modern 47. The usual consequence of violating this principle has been that the attorney is debarred from receiving any fee. *Silbiger v. Prudence Bonds Corporation*, 180 F.2d 917, 920 (2d Cir.1950). It is a doctrine that has been applied with great severity.

. . . . .

One Court has explained that the policy behind the "fee penalty" is that of preventing

the dishonest practitioner from [engaging in] fraudulent conduct, to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties ... *Gillette v. Newhouse Realty Co.*, 75 Utah 13, 282 P. 776, 779 (1929).

In other words, the penalty serves a prophylactic purpose. It strikes not only at actual evil, but at the tendency of divided loyalty to create evil. *Weil v. Neary,*

278 U.S. 160, 173, 49 S.Ct. 144, 149, 73 L.Ed. 243 (1929).[59]

In applying the various provisions of the Bankruptcy Code and of the Code of Professional Responsibility, courts with original and appellate jurisdiction have handed down numerous decisions defining and discussing attorney conflicts of interest. Foremost among these is the case of *Woods v. City National Bank & Trust Co. of Chicago, supra,* where the United States Supreme Court held:

Where a claimant, who represented members of the investing public, was serving more than one master or was subject to conflicting interests, he should be denied compensation. It is no answer to say that fraud or unfairness were not shown to have resulted. *Cf. Jackson v. Smith,* 254 U.S. 586, 589 [41 S.Ct. 200, 201, 65 L.Ed. 418].... Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation.[60]

■ It is well settled that the question of whether or not counsel should be disqualified due to an alleged conflict of interest in violation of the Code of Professional Responsibility is a legal one.[61]

■ This Court has stated that the anti-conflict of interest sections are designed to avoid a serious potential for conflicts of interest.[62] This prophylactic policy, set forth in the legislative history of Section 1103(b), requires that parties and their attorneys not only avoid conflicts, but be above suspicion.[63] In *In re Wasatch Factoring,*[64] this Court noted that "the mere appearance of a conflict has been held to be sufficient, as a matter of policy, to deny compensation." [65]

In *In re Chou-Chen Chemicals,* the court identified a number of cogent reasons for this policy:

In civil law countries, courts operate within a system of inquisitorial justice, with jurists performing a management role in the arbitration, mediation and compromise of disputes. There is much good to be learned from the system, particularly for bankruptcy courts, which without a jury constantly reapportion losses and restructure multiple contract rights and duties in the Chapter 11 context of commercial failure.

But the American system is one of adversarial justice, in which courts make clear and comparatively simple choices between conflicting claims. The adversary system requires as a minimum condition a clear identification of the parties to a dispute.

Strictly speaking the conflict of interest rule is a necessary adjunct to the adversarial method and therefore to the justice system itself, in that it defines and protects the boundaries of competing interests within the framework of any given litigation. Proper judicial perspective may be gained only by knowing exactly where those boundaries lie.

The lawyer working under the burden of a conflict of interest does a disservice to his court and runs the risk even of subverting the justice system. If a lawyer holds himself out as representing one party, but in reality represents another, either in addition to or instead of his stated retainer, that lawyer distorts the judicial perspective.

As officers of the court, lawyers frame issues and contend for results only as they might affect known interests. Judges direct their thinking and frame

**59.** *In re Paine,* 14 B.R. 272, at 274–275 (Bky.W. D.Mich.1981).

**60.** *Woods v. City National Bank & Trust Company of Chicago, supra,* 312 U.S. at 268, 61 S.Ct. at 497.

**61.** *In re Philadelphia Athletic Club, Inc., supra,* 20 B.R. at 332.

**62.** *In re Utah White Trucks, supra.*

**63.** See *In re American Tierra, supra,* at 8.

**64.** *In re Wasatch Factoring, Inc.,* No. 83A–00134, unpublished memorandum decision, at 5 (Bky. D.Utah Sept. 28, 1984) (Allen, J.).

**65.** See, *Mosser v. Darrow,* 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951).

their decision along the lines presented to them, the only lines they are allowed to know.

If a conflict of interests exists a court decision may impact in an unintended way or touch a party not meant to be reached by the judicial hand. The judicial function is particularly abused where, as here, one client is acknowledged but another is unspoken. A decision intended for the real party in interest may reach only the putative client or vice versa. Such a decision may unwittingly or with inadvertent force adjudicate rights not directly in issue. Judicial error, not necessarily correctible, can be created out of mistaken identity and the confusion of interests.

In a most practical way such a result could be described as "indirect adjudication," a concept foreign to basic notions of decency and fair play.

. . . . .

To the extent, then, that the conflict-of-interest rule forms an integral component of the judicial function, we must address it directly where it appears.[66]

## Disclosure of Conflicts of Interest

■ Under the Bankruptcy Code and Rules and the provisions of the Code of Professional Responsibility, attorneys who seek employment under Section 327 of the Code and who are aware that they may be involved in actual or potential conflicts of interest must disclose those facts to the court.

> Attorneys who seek appointment ... owe the duty of complete disclosure of all facts bearing upon their eligibility for such appointment. If that duty is ne-

glected, however innocently, surely they should stand no better than if it had been performed.... If the rule is to have vitality and the evils against which it is aimed are to be eliminated, it should be enforced literally.[67]

■ The court in *In re Haldeman Pipe & Supply Co.*,[68] as quoted in *Matter of Arlan's Department Stores, Inc.*, stated that it is the duty of counsel:

> to reveal all his connections with the bankrupt, the creditor or any other parties in interest. Had he made the disclosure then it would have developed upon the court to determine whether the conflicts existed.[69]

Failure to make such disclosure is a breach of fiduciary duty.[70]

Though a law firm is not expected to disregard its own welfare,

> neither is it expected to ignore its obligation to advise the court so that the court might make the determination of propriety based on the circumstances of the case.

. . . . .

> [T]he attitude of "That's for me to know and for you to find out," ... [is] totally incompatible with [the law firm's] fiduciary status as an officer of the court.[71]

This Court has made it clear that it has no duty to search the file to determine for itself that a prospective attorney is not involved in actual or potential conflicts of interest. It is the attorney's duty to so inform the court.[72]

## Specific Cases of Conflicts of Interest

In reaching its decision in this case, this Court has reviewed a majority of the re-

---

**66.** *In re Chou-Chen Chemicals, Inc., supra,* 31 B.R. at 851–853.

**67.** *Matter of Arlan's Department Stores, Inc.,* 615 F.2d 925, at 933, 5 B.C.D. 973, 21 C.B.C.2d 467, Bankr.L.Rep. (C.C.H.) ¶ 67253, (2d Cir.1979), *quoting, In re Rogers-Pyatt Shellac Co.,* 51 F.2d 988 (2d Cir.1931).

**68.** *In re Haldeman Pipe & Supply Co.,* 417 F.2d 1302, at 1304 (9th Cir.1969).

**69.** *Matter of Arlan's Dept. Stores, Inc., supra,* 5 B.C.D. at 978, 615 F.2d 925.

**70.** *Id.* at 978, 615 F.2d 925.

**71.** *Id.,* at 982, 615 F.2d 925.

**72.** *In re Career Concepts, supra,* at 7; *In re American Tierra, supra,* at 12–13. *See also, In re B.E.T. Genetics, Inc., supra,* 35 B.R. at 273; and *In re Coastal Equities Inc., supra,* 39 B.R. at 308.

ported bankruptcy decisions involving attorney conflicts of interest since the enactment of the Code. From this review the Court has distilled the following list of arrangements between attorneys and clients that have been held to constitute and not to constitute impermissible conflicts of interests. In setting forth this list, the Court does not imply its approval or disapproval of the holdings.

*An impermissible conflict of interest has been held to exist when an attorney or law firm represents:*

1. a debtor, where the attorney simultaneously represents the debt consolidation agency that referred the debtor to the attorney;[73]

2. a debtor, where the law firm simultaneously represents the debtor's numerous unsecured creditors;[74]

3. a corporate debtor, where the attorney simultaneously represents the co-owner of the debtor;[75]

4. a debtor, where (1) prior to the filing of the petition the law firm represented the debtor's affiliates, who filed claims in the case, (2) the law firm is an unsecured creditor for unrelated pre-petition legal services, and (3) an attorney of the firm is the debtor's assistant secretary and received loans from the debtor which the attorney used to buy interests in the affiliates;[76]

5. a debtor, where an associate of the law firm owns 38% of the stock of a company that arranged, post-petition, to buy appliances on credit from the debtor, who was in turn to buy the appliances from a supplier for cash;[77]

6. a debtor, where the attorney previously represented the debtor's largest unsecured creditor;[78]

7. a debtor, where (1) the law firm previously represented an individual who was the president and sole shareholder of the debtor, (2) a number of members of the firm had personal investments that involved this individual, (3) where two members of the firm were partners with this same individual in certain real estate projects, (4) where the firm's law offices were owned by a partnership in which firm members and this same individual were partners, (5) where this same partnership obtained a loan from the debtor for the purpose of refurbishing the firm's offices and (6) where one member of the firm enjoyed a close personal relationship with the chief operating officer of the debtor;[79]

8. a debtor, where the law firm also represented a person who was a creditor, stockholder of the debtor, and a purchaser of property of the estate;[80]

9. a corporate debtor, where the attorney also represented a principal of the debtor;[81]

10. a debtor, where the attorney received undisclosed fee payments on behalf of the debtor from the debtor's principal and investors, who were creditors and who were promised reimbursement for their contributions upon the court's approval of the attorney's fee application;[82]

11. a general partner of a debtor partnership, under circumstances where (1) the law firm previously represented as individuals both partners of the debtor partnership and (2) represents the partnership, a corporation the stock of which was owned by the partners of the partnership, and

---

**73.** *In re Smith, supra,* 5 B.R. 92.

**74.** *In re Paine, supra,* 14 B.R. 272.

**75.** *In re Chou-Chen Chemicals, Inc., supra,* 31 B.R. 842.

**76.** *In re B.E.T. Genetics, Inc., supra,* 35 B.R. 269.

**77.** *Matter of the Cropper Company, Inc., supra,* 35 B.R. 625.

**78.** *In re Arden Howard Spencer, supra.*

**79.** *In re Coastal Equities, Inc., supra,* 39 B.R. 304.

**80.** *In re Watson Seafood & Poultry Co., Inc.,* 40 B.R. 436 (Bky.E.D.N.C.1984).

**81.** *In re Wasatch Factoring, Inc., supra.*

**82.** *In re WPMK, Inc.,* 42 B.R. 157 (Bky.D.Haw. 1984).

affiliates of the corporation and the partnership; [83]

12. a partnership debtor, under circumstances where the attorney (1) simultaneously represents a creditor corporation controlled by one of the general partners and (2) gives legal advice to the general partners who were creditors; [84]

13. a partnership debtor in possession, where the law firm simultaneously represents the general partners of the partnership; [85]

14. a partnership debtor, where the attorney simultaneously represents two general partners, each of whom is also a debtor in bankruptcy; [86]

15. a corporate debtor in possession, where the law firm represents a corporation owning all issued and outstanding preferred stock of the debtor in possession as well as a corporation owning at least 80% of that corporation; [87]

16. a debtor in possession, where one member of the firm serves on the debtor's board of directors, another was secretary of the debtor, and both were equity security holders of the debtor; [88]

17. a corporate debtor in possession, where the two attorneys of the law firm were respectively the father and brother of the principle officer of the debtor; [89]

18. a debtor in possession, where the law firm previously represented (1) two creditors of the estate with conflicting claims to the debtor's collateral, (2) a principal and guarantor of the debtor, (3) an entity to whom the debtor transferred property and who had close and complex business dealings with the debtor, (4) the recipient within seven months of the filing of the petition of a parcel of property that was securing a debt owed to a creditor, and (5) where a member of the law firm is a shareholder, officer, and director of a creditor as well as being a shareholder of a parent corporation of this creditor; [90]

19. the trustee, a creditor, and the holder of an ownership interest in the debtor; [91]

20. the bankruptcy trustee, as general counsel, under circumstances where (1) the law firm also represents, as general counsel, a bank whom the trustee will probably be required to sue, (2) one of the firm's partners serves on that bank's board of directors, and (3) the members of the firm who would represent the trustee generally would also represent the bank in two pending proceedings; [92]

21. a Chapter 11 trustee, where the law firm had previously (1) represented two of three individuals asserting a partnership interest in an entity that held shares of the corporate debtor, (2) had submitted a plan of reorganization on behalf of two partners, (3) had later attacked the plan of reorganization of the third partner, (4) had accused the third partner of fraud, and (5) had secured his removal as debtor in possession in the case; [93]

22. a Chapter 11 trustee, where the law firm represents an individual who was a

83. *Matter of Barton & Ludwig, supra,* 9 B.R. 222.

84. *In re 765 Associates, supra,* 14 B.R. 449.

85. *In re Cottontree Inn Associates, supra.*

86. *In re Schofield Greenhouse,* No. 82A–03165, Memorandum Opinion of October 19, 1984, J. Allen (Bky.D.Utah 1984).

87. *In re Sambo's Restaurants, Inc., supra,* 20 B.R. 295.

88. *In re Leisure Dynamics, Inc., supra,* 32 B.R. 751; *see also, In re Leisure Dynamics, supra,* 32 B.R. 753; and *In re Leisure Dynamics, Inc., supra,* 33 B.R. 121.

89. *In re Career Concepts United Personnel, Inc., supra.*

90. *In re American Tierra, supra.*

91. *In re Chicago Rapid Transit Co.,* 93 F.2d 832 (7th Cir.1937).

92. *Matter of Perry, Adams & Lewis Securities, Inc., supra,* 5 B.R. 63.

93. *In re Philadelphia Athletic Club, Inc., supra,* 20 B.R. 328.

general partner as well as a creditor of the partnership debtor; [94]

23. a Chapter 11 trustee, where the law firm's former partner was the bankruptcy judge in the case; [95]

24. a bondholder's committee, an indenture trustee, the underwriters of the bonds, and other bondholders' committees for neighboring properties, where (1) the first bondholder's committee consisted of members who were variously (a) officer of the indenture trustee, (b) officers and employees of the underwriter, and (c) members of the bondholders' committees for the neighboring properties; (2) where the indenture trustee was also (a) the indenture trustee for neighboring properties and (b) the depository of the first bondholders' committee; and (3) where the underwriters of the bonds were also (a) members of the first bondholders' committee and (b) holders of an ownership interest in the debtor; [96]

25. a creditor's committee, under circumstances where the firm simultaneously represents any individual member of the creditor's committee or any other party in matters relating to the bankruptcy case; [97]

26. a creditor's committee, where the law firm is a member of the committee; [98]

27. a creditors' committee, where the law firm was simultaneously representing a particular creditor; [99]

28. a creditors' committee, where the firm also represented an individual creditor; [100]

29. a party to an adversary proceeding, when the opposing party is a former client of the attorney or law firm, under circumstances where there is a substantial relation between the subject matter of the former representation and the issues in the later adversary proceeding; [101]

30. a plaintiff in a civil proceeding, under circumstances where (1) the defendant is one of the two or three largest members of a trade association which was simultaneously represented by the law firm and where (2) the subject matter of the civil proceeding and the nature of the services rendered to the trade association are not sufficiently different to satisfy the strict test for permitting prosecution of a suit against a current client; [102]

31. a plaintiff in an adversary proceeding to determine dischargeability of a debt, where the attorney previously represented the defendant debtor in a prior related matter; [103]

32. the debtor in possession, as special counsel, hired to investigate the facts, particularly the identity of possible defendants of a potential state court action alleging a conspiracy to acquire control of the debtor by unlawful means, under circumstances where (1) the special counsel formerly represented the debtor, (2) the senior partner of the firm was a close personal friend of the debtor's president who was suspected of participation in the alleged conspiracy, (3) the law firm was a director and assistant secretary of the debtor and manager of one of the debtor's major real estate facilities, and (4) the law firm is a substantial unsecured creditor of the debtor; [104]

**94.** *In re Penoyer Farms*, No. 81M–03621, Transcript of Ruling of June 2, 1983, J. Mabey (Bky. D.Utah 1983).

**95.** *In re Michigan Interstate Railway Co. Inc.*, 38 B.R. 363, 11 B.C.D. 984, 10 C.B.C.2d 1079 (E.D. Mich.1983).

**96.** *Woods v. City National Bank and Trust Co. of Chicago, et al., supra*, 312 U.S. 262, 61 S.Ct. 493.

**97.** *In re Combustion Equipment Associates, Inc.*, 8 B.R. 566, 7 B.C.D. 188, 3 C.B.C.2d 847, Bankr. L.Rep. (C.C.H.) ¶ 67812 (Bky.S.D.N.Y.1981).

**98.** *In re Utah White Trucks, supra.*

**99.** *In re Broadcast Management Corp.*, 36 B.R. 519, 11 B.C.D. 789, 10 C.B.C.2d 40 (Bky.S.D.Ohio 1983).

**100.** *In re Itel Corporation, supra.*

**101.** *In re Pacific Homes, supra*, 1 B.R. 574.

**102.** *Glueck v. Jonathan Logan, Inc., supra*, 512 F.Supp. 223.

**103.** *Matter of Davis, supra*, 40 B.R. 163.

**104.** *Matter of Bohack Corporation*, 607 F.2d 258, 6 B.C.D. 171, 21 C.B.C. 749, C.C.H. Para. 67310 (S.D.N.Y.1980).

33. the debtor in possession, as special counsel, where the law firm was the debtor's general partner; [105]

34. a plaintiff-debtor, as special counsel, in an action for fraud against two defendant companies, where the law firm also represents, in an action for fraud against these same companies, an individual plaintiff who is the sole shareholder of a company that owns 50% of the debtor and who, therefore, has potential claims against the debtor.[106]

*On the other hand, an impermissible conflict of interest has been held NOT to exist when an attorney or law firm represents:*

A. a debtor, post-petition, under circumstances where the law firm represented the debtor pre-petition and happened to be one of the ten largest creditors—without anything more; [107]

B. a Chapter 7 debtor, where the two attorneys of the law firm were respectively the father and brother of the principle officer of the debtor; [108]

C. a Chapter 11 corporate debtor, where the law firm simultaneously defended certain of the debtor's officers and directors, without whom the reorganization could not proceed, and who had only nominal equity in the debtor and were being sued for fraud; [109]

D. an individual who was variously a debtor, debtor in possession, an equity owner, and a creditor; [110]

E. the debtor, (1) where two of the attorneys had engaged in a "de minimus"

and technical representation of a creditor in a post-petition matter that was for the benefit of the estate and (2) where that creditor had extended to the attorneys fee advances for services that did not advantage the creditors, or injure the estate, or prejudice other creditors, or amount to an actual conflict of interests; [111]

F. the trustee, where the attorney or the law firm is simultaneously serving as the trustee; [112]

G. a Chapter 7 trustee, as special counsel, where the law firm which represented some creditors, was hired for the specific purpose of investigating allegedly fraudulent activities of the debtor and of finding concealed assets of the estate; [113]

H. a Chapter 7 trustee, where (1) the law firm previously represented the creditors' committee in an aborted Chapter 11 case and (2) has, in the Chapter 11 case, an administrative claim for its services there, but where the firm did not previously represent any individual creditors; [114]

I. a Chapter 7 trustee, where the law firm had represented the prior Chapter 11 creditors' committee and was representing the present Chapter 7 creditors' committee, but had stated that it would withdraw as creditor's committee counsel if and when the court approved of its serving as counsel for the trustee; [115]

J. a trustee over two Chapter 11 reorganization cases, where the trustee initiates an adversary proceeding against a third party for recovery of stock and where it is not clear whether the stock, if recov-

---

**105.** *In re Hempstead Realty Associates, Inc., supra,* 34 B.R. 624.

**106.** *In re Johore Investment Company (U.S.A.), Inc.,* 41 B.R. 318 (Bky.D.Haw.1984).

**107.** *In re Heatron, supra,* 5 B.R. 703.

**108.** *In re Career Concepts fka United Personnel, Inc., supra.*

**109.** *Matter of FSC Corporation,* 33 B.R. 212, 11 B.C.D. 886 (Bky.W.D.Pa.1983).

**110.** *Matter of Georgetown of Kettering, Ltd.,* 28 B.R. 120 (Bky.S.D.Ohio 1983); *see also, Hunter*

*Savings Association v. Baggott Law Offices Co.,* 34 B.R. 368 (S.D.Ohio 1983).

**111.** *Matter of Olson,* 21 B.R. 123 (Bky.D.Neb. 1982); *see also, In re Olson,* 36 B.R. 74, 10 C.B.C.2d 798 (D.Neb.1983).

**112.** *In re Smith, supra,* 8 B.R. 699.

**113.** *In re Harry Fondiller, supra,* 15 B.R. 890.

**114.** *Matter of CODESCO, Inc., supra,* 18 B.R. 997.

**115.** *Matter of Market Response Group, Inc., supra,* 20 B.R. 151.

ered, will belong to one or the other Chapter 11 estates;[116]

K. a Chapter 13 trustee, where the law firm itself is acting as the Chapter 13 trustee;[117]

L. a creditor claiming ownership of substantial assets of the estate or a substantial security interest in those assets, where the firm formerly represented the debtor in opposition to the creditors filing an involuntary petition under Chapter 7, but where that debtor has approved both the firm's withdrawal as its counsel and the firm's continued representation of the creditors;[118]

M. creditors, where a member of the law firm represented two officers and shareholders of a corporation purchasing the debtor's assets pursuant to an agreement, and where the corporate purchaser had never been a client of the firm and the representative of the officers and shareholders was not related to the bankruptcy proceeding;[119]

N. the creditor's committee, where the law firm (1) represents the debtor's largest unsecured creditor; (2) represents another creditor with a $700,000 claim; (3) has a senior partner who represents a trade association to which the debtor belonged with a $100,000 claim against the debtor; (4) allegedly received confidential information from the debtor as a trade association member, under circumstances where the debtor claimed to have provided confidential material to the firm in connection with its representation of the association, but where the firm made no affirmative representation that it would keep such information confidential and such information was given at meeting in the presence of other association members; (5) formerly represented the debtor, over 20 years before, in

the defense of a lawsuit unconnected to the firm's representation of the creditors' committee; and (6) formerly conducted the defense of a lawsuit bearing only superficial relationship to the creditors' committee's involvement with the debtor's business affairs, and in which suit the debtor was but a minor defendant who paid no fee for the representation;[120]

O. a debtor in possession, as special counsel, in connection with a securities investigation, where the law firm was a creditor.[121]

## REMEDIES AND SANCTIONS FOR CONFLICTS OF INTEREST

### The Court's Duty

 This Court has the affirmative duty to be sure that "all attorneys who practice before it do so with full awareness of their responsibility to the public and to this court."

The role of counsel in all court proceedings is not merely to turn out, in a perfunctory and mechanical fashion, pleadings which simply "pass muster," but to conscientiously and ably represent a client in the highest tradition of the law.... The duty of every court in this area is appropriately set forth in the case of *In re Meeker*, 76 N.M. 354, 414 P.2d 862, 864 (1966), appeal dismissed 385 U.S. 449, 87 S.Ct. 613, 17 L.Ed.2d 510 (1967) in this directive:

The Canons of Professional Ethics must be enforced by the courts and must be respected by members of the bar if we are to maintain public confidence in the integrity and impartiality of the administration of justice.[122]

**116.** *In re O.P.M. Leasing Services, Inc., supra,* 16 B.R. 932.

**117.** *In re Smith, supra,* 8 B.R. 699.

**118.** *In re Stunzi U.S.A., Inc.,* 7 B.R. 401, 6 B.C.D. 1380 (Bky.W.D.Va.1980).

**119.** *Matter of Allied Artists Pictures Corp., supra,* 17 B.R. 288.

**120.** *Matter of Allied Artists Pictures Corporation,* 5 B.C.D. 636 (S.D.N.Y.1979).

**121.** *In re Tashof, supra,* 33 B.R. 225.

**122.** *In re Smith, supra,* 5 B.R. at 98–99.

In the case of *In re Watson Seafood & Poultry Co., Inc.*, the court stated:

> The bankruptcy court has a duty to examine all applications for attorney's fees. This duty exists even in the absence of objections, and when objections are raised the court's review is not limited to the items in controversy. 11 U.S.C. section 329. *In re Darke*, 18 B.R. 510, 8 B.C.D. 1059 (Bkrtcy.E.D.MI.1982); *In re Hamilton Hardward Co., Inc.*, 11 B.R. 326, 7 B.C.D. 963 (Bkrtcy.E.D.MI.1981); *In re Penn Fruit Co. Inc.*, 26 B.R. 81 (Bkrtcy.E.D.1982).[123]

In the case of *In re Pacific Homes*, the court held that the issue of conflicts of interest could be raised not only by "[a]ny attorney participating in the proceeding," but "on the Court's own motion." [124]

Furthermore, the *Pacific Homes* court, quoting the case of *Empire Linotype School v. United States*,[125] stated:

> The Court's duty and power to regulate the conduct of attorneys practicing before it, in accordance with the Canons, cannot be defeated by the laches of a private party or complainant.[126]

### Disqualification

In *In re B.E.T. Genetics, Inc.*, the court stated that:

> A court can disqualify counsel from a case solely on the basis of Canon 9. [*In re Coordinated Pretrial Proceedings in Petroleum Products, Antitrust Litigation*,] 658 F.2d [1355 (9th Cir.1981)] at 1360. Courts have disqualified or denied compensation to attorneys who simultaneously represent clients who hold adverse interests to each other. *In re Chou-Chen Chemicals, Inc.*, [31 B.R. 842] 10 B.C.D. 1103 (Bkrtcy.W.D.Ky.

1983); *In re Sambo's Restaurants*, 20 B.R. 295 (Bkrtcy.C.D.Cal.1982); *In re Paine*, 14 B.R. 272 (W.D.Mich.1981). And courts have disqualified attorneys who act on behalf of a client and thereafter represent another client whose interests are adverse to the former client. *In re Philadelphia Athletic Club*, 20 B.R. 328 (E.D.Pa.1982); *In re Buchanan*, 25 B.R. 162 (Bkrtcy.E.D.Tenn. 1982).[127]

In order for the Court to disqualify counsel under Canon 9, there must be a showing that there is a "reasonable possibility of the occurrence of a 'specifically identifiable appearance of improper conduct,' and that the 'likelihood of public suspicion or obloquy outweighs the social interest' in obtaining counsel of one's choice." [128]

In *In the Matter of Allied Artists Pictures Corp.*, the court stated:

> Disqualification of an attorney is not lightly granted. Our Circuit Court, in *Armstrong v. McAlpin*, 625 F.2d 433 (2d Cir.1980), identified only two circumstances in which disqualification will be ordered:

> . . . . .

> (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client, ... or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Can-

---

**123.** *In re Watson Seafood & Poultry Co., Inc., supra*, 40 B.R. at 438.

**124.** *In re Pacific Homes, supra*, 1 B.R. at 581, citing, *United States v. Standard Oil Company*, 136 F.Supp. 345, at 351 n. 6 (S.D.N.Y.1955), and *Porter v. Huber*, 68 F.Supp. 132 (W.D.Wash. 1946).

**125.** *Empire Linotype School v. United States*, 143 F.Supp. 627, at 631 (S.D.N.Y.1956).

**126.** *In re Pacific Homes, supra*, 1 B.R. at 581.

**127.** *In re B.E.T. Genetics, Inc., supra*, at 35 B.R. at 271.

**128.** *Kraft, Inc. v. Alton Box Board Co.* (*In re Corrugated Container Antitrust Litigation*), supra 659 F.2d at 1345, *as quoted* in *Matter of the Cropper Company, Inc., supra*, 35 B.R. at 632.

ons 4 and 9, thus giving his present client an unfair advantage....

Id. at 444, quoting *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979); *see also, Cheng v. GAF Corp.*, 631 F.2d 1052 (2d Cir.1980).[129]

Of course, the courts have indicated a great reluctance to "separate a client from his chosen attorney where the alleged misconduct does not prejudice an opposing party and taint the litigation in which he is appearing." [130]

The imputability of disqualification to the entire firm is required by Disciplinary Rule 5–105(D), which states:

If a lawyer is required to decline employment ... no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.[131]

Although, the Court is aware that

disqualification motions, which are collateral to the merits of a case, have substantially increased in number and are used for purely tactical reasons. *See*, *Armstrong v. McAlpin*, 625 F.2d 433, 437 (2d Cir. En Banc Court 1980); and cases cited therein.[132]

## Denial or Reduction in Costs and Fees

 Section 328(c) of the Code provides:

Except as provided in section 327(c), 327(e), or 1107(b) of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

In interpreting this provision, the court in *In re 765 Associates*, stated:

This subsection authorizes a court to deny compensation for services rendered and reimbursement of expenses in situations where there are conflicts of interest.[133]

In *In re Utah White Trucks*, this Court, in an oral ruling, has likewise held that Section 328(c) authorizes a court to "deny compensation for services and reimbursement of expenses where a professional represents an adverse interest." [134]

The Ninth Circuit case of *In re Haldeman Pipe & Supply Company*,[135] recognized that such a denial was a matter of discretion with the court. That was the view taken by this Court in *In re Penoyer Farms*.[136]

In that case, Roe & Fowler made application for compensation before Judge Ralph Mabey, who, in an oral ruling denying compensation, made the following pertinent observations:

First, there are strict standards of professional responsibility which ought not be lightly compromised. As Justice Cardozo noted in terms now familiar to most of us:

Many forms of conduct permissible in a work-a-day world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor

---

**129.** *In re Allied Artists Pictures Corp., supra*, 17 B.R. at 290.

**130.** *Matter of Bohack Corporation, supra*, 607 F.2d at 263.

**131.** This quotation is from the ABA's Model Code of Professional Responsibility as amended in 1980; Utah's version omits the reference to "any other lawyer." *See also, In re Leisure Dynamics, supra*, 32 B.R. at 752–753.

**132.** *Matter of CODESCO, supra*, 18 B.R. at 1001.

**133.** *In re 765 Associates, Inc., supra*, 14 B.R. at 452.

**134.** *In re Utah White Trucks, supra*.

**135.** *In re Haldeman Pipe & Supply Company, supra*, 417 F.2d 1302.

**136.** *In re Penoyer Farms, supra*.

most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular circumstances. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by a judgment of this court.

Justice Cardozo was speaking at the time for the New York Court of Appeals in the case of *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (N.Y.1928).

A rule which awards fees to counsel, notwithstanding his conflict of interest, on the premise that there was some good along with any threatened harm, may say that the principle of disinterestedness could be bartered away for some material advantage and that the standards of a fiduciary in effect might be compromised where the gain or price is sufficient. In light of Justice Cardozo's statement, it seems to be a dangerous course and one which it appears to me from the case law the courts have been loathe to follow.

Presumably from the articulated reasons there is also a concern in the courts for the integrity of the system and the judicial process which seeks to hold counsel above suspicion and not merely to avoid any real harm.

Thus, it seems to me that the argument that possible harm ... could be counter-balanced by greater benefit [to the estate], ... does not cover the ... policy considerations which look to the harm to representation, the loss of confidence, etc.

The denial of compensation [in such circumstances] is prophylactic. It constitutes a deterrent. And I am moved in this direction by the comments of Justice

Douglas in the case of *Woods v. City Bank,* 312 U.S. 262, at 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941):

. . . . .

I believe Justice Douglas has, among other things, ... stated the real difficulty: It is almost impossible for a court to determine what benefit has accrued to the estate as opposed to what detriment might have accrued ... absent a conflict of interests....

. . . . .

Now, the denial of fees is not mandated in all cases, and equities might compel another result, but I do not think that such is true on these facts. There were a number of conflicts, and there was no disclosure of the relationship which existed.

It appears that the Bankruptcy Rules and the courts seek a disclosure of questionable relationships, even where counsel has determined that they pose no threat to the integrity of the process or where they do not offend any rules.

Indeed, there are a number of courts which have ruled that the simple fact of failing to disclose any relationship with the debtor, as the Bankruptcy Rules clearly require, is sufficient to constitute a denial of fees. I refer to the case of *In the Matter of Arlan's Department Stores, Inc.,* 615 F.2d 925 (2d Cir.1979); *In the Matter of Futurtronics [Futuronics] Corporation,* 655 F.2d 463 (2d Cir.1981); and *In re Haldeman Pipe and Supply Co., supra.*[137]

The *Chou-Chen Chemicals* court held that a bankruptcy court not only has power to deny compensation, it also has:

inherent power to assess a penalty for violation of professional canons, notwithstanding the absence of express statutory authority.[138]

The *Paine* court relied upon ethics and public policy in concluding that the

---

**137.** *In re Penoyer Farms, supra;* and *In re Chou-Chen Chemicals, Inc., supra,* 31 B.R. at 850.

**138.** *In re Chou-Chen Chemicals, Inc., supra,* 31 B.R. at 850, *citing, In re Paine, supra,* 14 B.R. 272.

awarding of fees to attorneys whose representation was subject to conflicting interest would have the undesirable effect of undermining public confidence in the integrity of the judicial function, particularly regarding bankruptcy proceedings.[139]

The court in *In re 765 Associates* ruled that the provisions prohibiting attorney conflicts of interest were "found upon principles of public policy" and were necessary to "further the orderly administration of justice and to foster respect for the profession and the courts."[140]

For these reasons the *765 Associates* court required not only disallowance of fees, but required the refund of fees already advanced.

The *Chou-Chen Chemicals* court concluded that "once a conflict of interest is shown, attorney's fees should be entirely denied, even though the service rendered had intrinsic value and brought a benefit to the bankrupt estate."[141]

■■■ As the court noted in *In re Watson Seafood & Poultry Co., Inc.*:

There is also a line of cases decided under the Bankruptcy Act of 1898 beginning with *Silbiger v. Prudence Bonds Corporation,* 180 F.2d 917 (2d Cir.1950), *cert. denied,* 340 U.S. 813, 71 S.Ct. 40, 95 L.Ed. 597 (1950), which holds that the rule denying compensation should be relaxed somewhat in corporate reorganization cases. See also, *Securities & Exchange Commission v. Cogan,* 201 F.2d 78 (9th Cir.1951), aff'd on rehearing, (1952); *Chicago & West Towns Railway v. Friedman,* 230 F.2d 364 (7th Cir.1956), cert. den., 351 U.S. 943, 76 S.Ct. 337, 100

L.Ed. 1469 (1956); *Cleware Industries, Inc. v. Sokolsky,* 493 F.2d 863 (6th Cir. 1974).[142]

After analyzing this split in the opinions as to whether fees should be routinely denied attorneys whenever a conflict of interest is present or whether a more flexible approach should be applied, the *Watson Seafood* court stated its conclusion, with which this Court concurs:

[B]ecause a bankruptcy court is a court of equity (*Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed. 197 (1966), the bankruptcy judge should not be bound by a completely inflexible rule mandating denial of all fees in all cases. The general rule should be that all fees are denied when a conflict is present, but the court should have the ability to deviate from that rule in those cases where the need for attorney discipline is outweighed by the equities of the case. This flexibility is supported by 11 U.S.C. 328(c), which says that the court "may" (rather than "shall") deny compensation when counsel represents an interest adverse to the interest of the estate.[143]

## DECISION

■■ In the case before the Court, the law firm was not only involved in a multiplicity of conflicts of interest, but failed to disclose these involvements to the Court. Moreover, this is not the first time this law firm has faced this Court with the identical issue on very nearly the same facts.[144]

In this case, this law firm represented (1) the individuals, Larry and Barbara Roberts, and (2) the corporation, Roberts, Inc. prior to the filing of their respective petitions in bankruptcy. This was itself a rep-

**139.** *In re Paine, supra,* 14 B.R. at 275.

**140.** *In re 765 Associates, supra,* 14 B.R. at 451, quoting, *Gillette v. Newhouse Realty Co., supra,* 282 P. at 779.

**141.** *In re Chou-Chen Chemicals, Inc., supra,* 31 B.R. at 850–51. *See also, In re B.E.T. Genetics, Inc., supra,* 35 B.R. at 273; *Matter of the Cropper Company, Inc., supra,* 35 B.R. 625; *In re Arden Spencer Howard, supra,* at 4; *In re Cottontree Inn Associates, supra; In re Paine, supra,* 14 B.R. 272; *In re 765 Associates, supra,* 14 B.R.

449; *In re Philadelphia Athletic Club, Inc., supra;* 20 B.R. 328; *In re Buchanan,* 25 B.R. 162 (Bky. E.D.Tenn.1982); and *In re Sambo's Restaurants, supra,* 20 B.R. 295.

**142.** *In re Watson Seafood & Poultry Company, Inc., supra,* 40 B.R. at 439–40.

**143.** *Id.,* 40 B.R. at 440.

**144.** *In re Penoyer Farms, supra,* and *In re Cottontree, supra.*

resentative of conflicting interests: first, because the representation of the individuals, who were principals of the corporation was at variance with the representation of the corporate entity; and second, because Larry Roberts owed the corporation $43,196.51; and the corporation owed Barbara Roberts $57,693.87. This simultaneous representation of clients with adverse interests was in direct violation of the Professional Codes' Ethical Canons 1, 4, 5, 6, and 9. The representation was prejudicial to the administration of justice. It raised the potential for the violation of these clients' secrets and confidences. It substantially compromised the law firm's independent judgment on behalf of both the individuals and the corporation. It put into question counsel's ability to provide competent representation. And it bore the clear marks of impropriety.

Because the law firm continued the post-petition representation of all these clients, all of its violations of the Canons of Ethics also became violations of the Bankruptcy Code and this Court's and the Utah District Court's local rules. Thus, the law firm additionally offended the provisions of Sections 327(a), prohibiting the representation by an attorney for a debtor in possession of an interest adverse to the estate. The law firm also violated the Section 327(a) "disinterestedness" requirement because, as a creditor of the debtor, the law firm continued to assert, in the corporation's case, its claim for attorney's fees, for services unrelated to the bankruptcy, in the sum of $2,241.50.

This Court is aware that attorneys are faced with a dilemma whenever a client, who owes legal fees for past services related or unrelated to the bankruptcy case, decides to file a petition in bankruptcy.

■ It is clear, under Section 1107(b) of the Code, that the sole fact that an attorney previously represented a client will not, of itself, render that attorney disqualified to serve as general counsel to that client acting as debtor in possession.

But what if that attorney is owed fees for past services by a client who wishes to file a petition under Chapter 11 and wishes that attorney to serve as general counsel in the bankruptcy case? Will that attorney's status as both creditor and general counsel to the debtor in possession create an impermissible conflict of interests such as to require the disallowance of or reduction in the legal fees and costs earned in the case?

■ In the opinion of this Court, a law firm serving as general counsel for a debtor in possession, which is owed on the date of filing a pre-petition debt for legal fees or costs incurred solely for services rendered in contemplation of and in connection with the bankruptcy case, does not because of this debt hold an interest adverse to the estate nor does it lack disinterestedness in violation of Section 327(a) of the Code. In this situation, these pre-petition fees and costs are recoverable as part of the fees allowed, generally, under Sections 327, 329, and 330 of the Code and Bankruptcy Rule 2014. It would be a disservice to the principles of bankruptcy policy to chill exploration of alternatives to bankruptcy by the debtor's counsel by denying its request for fees under these circumstances.

■ If, however, the law firm is owed by a petitioning client, on the date of filing, a pre-petition debt for legal fees for services not rendered in contemplation of or in connection with the bankruptcy case, then the law firm would be a creditor of the debtor to the extent of those fees and costs and, therefore, would run afoul of the "no adverse interest" and "disinterestedness" requirements of Section 327(a). In such a circumstance, the conflict of interest would not be eliminated if the law firm obtained from the client a pre-petition payment of these fees and costs because such a payment would likely constitute a preference that may be avoided for the benefit of other creditors, thus involving the law firm in a conflict of interest as the holder of an interest adverse to the estate in violation of Section 327(a).

To avoid this predicament, a law firm could waive all fees and costs incurred for services unrelated to the bankruptcy case, thus eliminating its status as a creditor of the debtor in possession.

850

A less drastic approach would require the law firm to obtain from its client its fees and costs in a contemporaneous exchange for its services unrelated to the bankruptcy case. This could be accomplished in a number of ways. For example, the law firm could obtain a pre-service retainer to cover work unrelated to the bankruptcy case and deduct from this retainer the sums owed as they come due. This deduction could take place either as the legal work is accomplished or at the end of regular billing periods.

It is the opinion of this Court that, even without obtaining such a pre-service retainer, a law firm that bills regularly and is paid in the ordinary course of its business and the business of the debtor, would obtain its fees as part of a contemporaneous exchange.

The requirements of § 327(a), of course, do not apply to attorneys representing debtors out of possession or attorneys seeking employment as special counsel under § 327(e), where the specialized services, approved of by the court, will not probably be compromised by the existence of a lack of "disinterestedness."

Roe & Fowler, as general counsel to these Chapter 11 debtors in possession, however, is not entitled to avail itself of these exceptions.

To its other violations must be added this law firm's failure to disclose, either in its applications for appointment as counsel or in its fee applications, the existence of any of its conflicting involvements. This failure not only violates Section 327 and Bankruptcy Rule 2014, but the repeated and clear rulings of this and other courts.

The usual sanctions for these violations is, as has been shown, a denial of all fees and costs sought. This sanction, however, need not be applied in all cases. The Court is free to exercise its equitable powers if mitigating circumstances are present.

In this case, however, there exist no such mitigating circumstances. Rather, the Court has before it a firm that has offended the anti-conflict of interest laws for the

third time. This trend the Court cannot allow. For these reasons, the Court shall deny Roe & Fowler's applications for fees and costs in these cases.